TWIN CITY COACH COMPANY *v.* STEWART, ADMINISTRATOR.

4-7687                                   190 S. W. 2d 629

Opinion delivered November 12, 1945.

Rehearing denied December 10, 1945.

*Partain, Agee & Partain* and *Hardin, Barton & Shaw,* for appellant.

*Jeptha A. Evans,* for appellee.

GRIFFIN SMITH, Chief Justice. Dewey Stewart, as administrator, sued to compensate damage occasioned when his daughter, Valeta, was killed in an automobile-bus collision April 22, 1944. The tragedy occurred on Midland Boulevard—connecting Fort Smith and Van Buren.

Midland is a two-lane thoroughfare divided by a strip twenty-four inches wide. Each roadway is twenty-eight feet and five inches in width.

Appellant's bus, driven by Bill Booth, had proceeded southwardly from Van Buren to Fort Smith, making stops at intersections where passengers indicated an intention to get on or off. At a point within the Fort Smith city limits, Booth stopped the bus near the curb where one passenger got off and twelve or fifteen soldiers were ready to enter. Booth estimated that after stopping, two minutes elapsed before the impact of a car from the rear was felt. Allegation of negligence is that the bus was parked too far from the curb—"four or five feet," one witness testified. It is also insisted that the bus suddenly stopped without giving appropriate warnings, etc. A Fort Smith ordinance requires that busses must park with the right wheels not more than twelve inches from curb or gutter.

Of the six errors alleged in the motion for a new trial, we find it necessary to consider but two: (a) that the Court was without jurisdiction because appellee's intestate was a resident of Sebastian County, where the fatal injury occurred, and (b) the defendant's request for a directed verdict should have been given.

*First.*—October 16, 1944, we denied the defendant's petition for a writ of prohibition directed to the Logan Circuit Court, giving as a reason that a question of fact was involved in respect of which this Court would not presume there would be an incorrect determination. The point was preserved and has been re-presented.

We agree with counsel for appellee that the venue was properly laid in Logan County. Circumstances attending the conduct of one who leaves home in search of employment usually afford substantial guidance when (after an injury has occurred and the question of venue is raised) such person's intentions and purposes become the subject of judicial consideration. See *Norton* v. *Purkins, Judge*, 203 Ark. 586, 157 S. W. 2d 765; *Southern Compress Company* v. *Elston*, 204 Ark. 180, 161 S. W. 2d 202.

*Second.*—Elam Hoffman, soldier who had received his medical discharge, was driver of the death car. He met Valeta (eighteen years of age) at eight o'clock in the evening and together they got Elam's brother and two sisters. Thereafter they went to a cafe and were joined by others, including Paul Edgin, who also had an automobile. From the cafe (Wisley's Place on Midland Boulevard) they left with the intention of visiting a dance hall on Garrison Avenue. Edgin and others started just ahead of Hoffman, but slowed down to allow Hoffman and his companions to pass. As they drew alongside[1] someone called from Edgin's car, "We will see you down town." Hoffman then drove on; and, as he says, while proceeding at 30 or 35 miles an hour, crashed into the bus. The bus, he says, was "angling to the curb," with the back farther out than the front—how far, he could not say. Hoffman did not see the bus driver or any stop lights, although he was looking. The right part of his car struck the left rear of the bus—"all I saw was the lights on top. *I started to pull around when I saw that the bus was stopped.*"

Edgin's testimony was that he was driving 35 miles an hour "when I caught up with [Hoffman]." Q. "He overtook you?" A. "Yes, sir." Q. "He passed you?" A. "Yes, sir." Q. "Some words were passed between you?" A. "Yes, sir." . . . Q. "He went on faster than you did?" A. "Yes, sir." Q. "The front of your car was even with his?" A. "It was a little farther back than

---

[1] The statement was made by Elam Hoffman on direct examination.

that." Q. "You saw the bus then?" A. "Yes, sir." Q. "You saw the car run into it?" A. "Yes, sir."

Edgin and his companions drove a short distance beyond the parked bus to a fire station. Some of them then returned to the scene of accident. Edgin, who had made a written statement shortly after April 22, was asked if he hadn't said: "About the time I got even with the front of the bus I heard a crash and saw that Elam's car had run into the rear of the bus." After first answering that he "didn't believe" he made that statement, the witness said: "I made a statement, but I don't know whether it was that or not." A transcript of testimony given by Edgin in Municipal Court where Hoffman was tried was read for the purpose of refreshing Edgin's memory. He admitted that impressions were clearer then than later. There was this further testimony: "I saw the bus and heard the crash. [The first information I had of the accident was when I heard the crash.] I had to look sideways to see it." Q. "What did you mean when you said, 'I got [as] close to the middle as I could—I guess I was halfway to the front when it hit the back end.'" A. "That was about right."

Vernice Rogers, a witness for the plaintiff who was in the back seat of Hoffman's car, did not see the bus until the instant of collision, and knew nothing regarding the immediate transaction. Concerning circumstances attending their leaving Wisley's cafe, the following testimony discloses the general attitude of those who participated: Q. "That is a dance place—a restaurant and beer place?" A. "Yes, sir." Q. ". . . Then Paul Edgin, with Lewis and his wife and Florence and a soldier, left in his car, and then you and Elam and Valeta and Wade left in Hoffman's car?" A. "Yes, sir."[2] Q. "Do you know how many minutes [the Edgin car] left ahead of you?" A. "It was just a few minutes." Q. "Your car overtook him on the way?" A. "Yes, sir." Q. "You were talking back and forth as they drove along?" A. "Yes,

[2] There is conflict in some of the testimony as to whether Hoffman or Edgin left the cafe first. This appears to be accounted for by reason of the fact that they passed each other several times.

when we first started out." Q. "After you overtook him?" A. "Yes, sir."

Vernice did not know whether Edgin was "alongside" the Hoffman car when the impact occurred. Q. "You saw the bus an instant before the accident?" A. "Yes: there was the bus,—and 'just like that,' they hit! That is the best I recall."

Paul Graham testified that he was a passenger on the bus, intending to go to Fort Smith. When the stop was made he observed a skating rink on the opposite side of Midland Boulevard and concluded to get off the conveyance. The time was about 10:30. When the idea of going to the rink occurred to Graham, four or five passengers (soldiers) had gotten on the bus from the front end.—"I pulled the cord and got off [through] the back door and went to the back of the bus to cross the street [on my way to] the skating rink. I got just about the middle of the bus and saw two cars coming behind the bus— a Chevrolet and a Ford. They were about a quarter of a block [away] when I first saw them, so I jumped back on the curb. [One of the cars] was coming just in line with the bus—right down the highway. They were both picking up speed and making about sixty miles an hour when [Hoffman's car] hit [the bus]. . . . They were [driving] side by side, and both stayed at an 'even keel.' [The Hoffman car] did not seem to be going around, so I jumped back on the curb and stood there and saw it hit the bus. It was a terrible jolt, and the back of the car went up and came down, and all were 'knocked out'—unconscious. The other car went by the bus. They were [about] even but as the other car went on it was a little in the lead when they got to the bus. . . . The bus was parked right against the curb; it couldn't have been more than a foot, as I stepped off to the curb. After the accident the [Hoffman] car was two or three feet, 'or something like that' [from the curb].''

It is argued on behalf of appellee that because Hoffman testified he was unable to go around the bus, a fair inference is that because it was parked at an angle there was insufficient room for Hoffman to clear such an ob-

struction. But Hoffman did not testify that the bus alone blocked his way. When asked, ''Why didn't you go around?'' he replied, ''I couldn't; *they* had me blocked on the left.'' Effect of Edgin's testimony is that the car he was driving and the one driven by Hoffman were almost parallel. They were traveling at a rate of speed certainly not less than thirty miles an hour—the lowest estimate made by any of the plaintiff's witnesses. Edgin says thirty-five miles. Others say sixty. But in any event Edgin's car was, for all practical purposes, on Hoffman's left when, as he testified, the bus lights loomed up in front; and, *''they* had me blocked.'' Hoffman does not know whether the bus was moving or parked, because he hadn't seen it until the instant of impact. Others in the cars were equally uncertain.

There is no substantial evidence that the bus suddenly stopped. It has not been shown by any of the witnesses that a failure to give signals, or a sudden stop, prevented Hoffman from clearing the obstruction. His testimony is susceptible of the inference that the bus was at rest before Hoffman reached a point where ordinarily an emergency would arise, for his explanation is, ''I started to pull around it when I saw that the bus was stopped.''

Was the bus parked at an angle? Probably so. For the purpose of this decision we must assume that the rear end was four or five feet from the curb. This may not be true; but there is substantial testimony to that effect and the jury's verdict precludes our reëxamination of that single fact. But it does not follow, as a matter of course, that erroneous parking was the proximate cause of injury. Position of the bus was merely evidence of negligence—a circumstance for the jury's consideration, something upon which a verdict may be predicated if, in the light of all the surroundings it can be said that the defendant was negligent, and that such negligence occasioned the damage complained of. Conceding the first element—that there was *evidence* of negligence—would

reasonable minds agree that this negligence caused Hoffman to drive headlong into the rear of a parked bus?[3]

Edgin's testimony, and that of other witnesses for the plaintiff, is subject to the single conclusion that the Ford and Chevrolet were running parallel, with Edgin blocking the lane into which Hoffman would have had to swerve with instantaneous impulse to avoid the bus. According to Hoffman's detailed testimony he was virtually "on" the bus before he saw it; therefore, in order to prevent the collision he must have turned at a sharp angle. This could not be done because Edgin was in the other lane. But, it is insisted, the bus was parked three feet farther from the curb than the law authorized; and this may have been controlling. Photographs disclose that the entire front of the Hoffman car was wrecked; and physical evidence is that the greater width of the automobile struck the bus. This is emphasized by Hoffman's statement that the bus just loomed large in front of him, and the impact came. It is true he testified that he could not go around it because "they" blocked the boulevard. Even so, "they" included Edgin; and by any construction of the evidence at least five feet of the bus was rightfully in the lane from which Hoffman would have turned if it had not been blocked.

Since there is a want of substantial evidence to sustain the plaintiff's theory that the defendant's negligence in parking the bus materially contributed to the event, it must be held that the proximate cause was Hoffman's carelessness in racing along the highway in complete disregard of possible obstruction.

The judgment is reversed. The cause, having been fully developed, should be dismissed. It is so ordered.

Mr. Justice McFADDIN dissents.

McFADDIN, J., dissenting. The majority holds: (1) that venue was in Logan county, and (2) that a directed verdict should have been given for the defendant.

---

[3] It is not seriously argued that Hoffman and those with him were not on a joint mission; hence imputed negligence is not an issue.

I.   *Venue.*  I agree with the majority on the question of venue: although, in sustaining the venue in Logan county, I think we are weakening, if not impliedly overruling, the case of *Norton* v. *Purkins,* 203 Ark. 586, 157 S. W. 2d 765.

The majority opinion did not give the facts regarding the venue question in the case at bar. Here are the facts: Miss Valeta Stewart became 18 years of age on March 7, 1944, and was killed in Fort Smith, Arkansas, on April 22, 1944. Her parents lived in Booneville, in Logan county; and she lived in the home with them until April 19, 1943, when she began working as a waitress at a cafe in Fort Smith, in Sebastian county. Miss Stewart and other girls had an apartment in Fort Smith, and paid the rent monthly. She kept her clothes in Fort Smith. She worked six days a week in the cafe, and went to Booneville on her rest day ''nearly every week,'' and took her soiled clothes to Booneville where she and her mother laundered them. During three weeks in early 1944 the cafe was closed for repairs; and Miss Stewart spent this time with her parents in Booneville. There is no record of any voting or payment of taxes.

The question was whether, under the venue statute (Act 314 of 1939), Miss Stewart ''resided at the time of injury'' in Logan county. A comparison of the above facts with those detailed in *Norton* v. *Purkins* leads me to the conclusion that no sound distinction can be drawn between the two cases. But I think that *Norton* v. *Purkins* took too narrow a view of residence, and the present holding goes more to the correct conclusion, which is that residence may be *domicile* as well as the *place of temporary sojourn.* So I agree with the majority on the venue question.

II.   *Instructed Verdict.*  My dissent in this case is on this issue of the instructed verdict. Appellee's instruction No. 1 was abstract—insofar as the bus *being about to stop* was concerned—and the judgment should be reversed; but the cause should be remanded instead of dismissed. I think there was evidence that would carry the

case to the jury on correct instructions on the question of whether the illegal position of the bus was the negligence that proximately caused the injury. The majority opinion recites "position of the bus was merely evidence of negligence—a circumstance for the jury's consideration, something upon which a verdict may be predicated if in the light of all the surroundings it can be said that the defendant was negligent, and that such negligence occasioned the damage complained of." Who is to consider whether the position of the bus was the proximate cause of the collision? The majority, in the above quotation, has said that the position of the bus was a circumtance for the *jury's* consideration; and yet the majority holds that there was not sufficient evidence to take the case to the jury!

There was introduced in evidence an ordinance of the city of Fort Smith requiring vehicles to be parked close to the curb. The ordinance provided that a vehicle (such as the appellant's bus) should be "parallel with the edge of the roadway, headed in the direction of traffic, and with the curb-side wheels of the vehicle within twelve inches of the edge of the roadway." It is undisputed that the bus in question was in a position in violation of that ordinance. One witness testified that the rear end of the bus was "around four to five feet from the curb and the front was about two feet from the curb." Further, it was testified by the witness, Edgin, that he was over to the center of the street as far as he could go. He said:

"I got as close to the middle as I could."

Hoffman testified that there was not sufficient space between Edgin's car and the protruding end of the bus for Hoffman's car to pass the bus. The majority opinion refers to the photographs in the record. I have examined these carefully; and they do not disclose where the bus was struck. They do show—to my satisfaction— that the right front part of the Hoffman car received the greatest force of the impact; and that circumstance lends support to Hoffman's testimony.

I have recited some of the facts, in order to show that the question of who was at fault could only be determined by the drawing of inferences, and the reaching of a conclusion from these facts and others, detailing all of which would considerably lengthen this opinion. The question is: was the collision proximately caused by the illegal parking of the bus, or by the reckless driving of Hoffman? If, by the illegal parking of the bus, then there is liability; if, by the reckless driving of Hoffman, then there is no liability. To answer the question is to determine a factual issue; and the jury should decide it. The crux of the whole matter is this: Who should draw inferences and reach conclusions? I unhesitatingly answer: "the jury"; and I quote from my dissenting opinion in the case of *Union Central Life Insurance Co.* v. *Sims,* 208 Ark. 1069, 189 S. W. 2d 193:

"Who should draw these inferences and reach these conclusions? The jury. Our cases all hold to that effect. In *Grand Lodge of A. O. U. W.* v. *Banister,* 80 Ark. 190, 96 S. W. 742, 744, Mr. Justice McCulloch said: 'if the facts are such that men of reasonable intelligence may honestly draw therefrom different conclusions on the question in dispute, then they are properly submitted to the jury for determination. Judges should not, under that state of the case, substitute their judgment for that of the jury.' In *St. Louis Ry. Co.* v. *Coleman,* 97 Ark. 438, 135 S. W. 338, 339, Ch. J. McCulloch said: 'When the testimony, though unconflicting, is such that different minds may reasonably draw different conclusions therefrom, then it is the duty of the trial court to submit the issues to the jury for determination, and on appeal the verdict of the jury should not be disturbed.' In *St. Louis, I. M. & S. Ry. Co.* v. *Fuqua,* 114 Ark. 112, 169 S. W. 786, 788, Mr. Justice Hart said: 'The rule is that where fair-minded men might honestly differ as to the conclusion to be drawn from the facts, whether controverted or uncontroverted, the question at issue should go to the jury.' See, also, *Mississippi River Fuel Corporation* v. *Senn,* 184 Ark. 554, 43 S. W. 2d 255, and many other cases collected in 16 West's Ark. Dig., Trial, § 142, and see also

64 C. J. 346. . . . I think the majority opinion invades the province of the jury, so I respectfully dissent from the dismissal of the case. .There were errors in the instructions which would necessitate a reversal, but the cause should be remanded for a new trial.''