MARTHA YATES, Plaintiff-Appellant, v. ADEL EL-DEIRY et al., Defendants-Appellees.

Third District No. 3—86—0766

Opinion filed September 1, 1987.—Rehearing denied October 6, 1987.

Jay H. Janssen and Jerelyn D. Maher, both of Peoria, for appellant.

Mark D. Howard, of Heyl, Royster, Voelker & Allen, of Peoria, for appellee Adel El-Deiry.

Murvel Pretorius, Jr., of Quinn, Johnston, Henderson & Pretorius, Chartered, and Lauren K. Meachum, of McConnell, Kennedy, Quinn & Johnston, Chartered, both of Peoria, for appellee Proctor Community Hospital.

JUSTICE HEIPLE delivered the opinion of the court:

The plaintiff, Martha Yates, underwent surgery at Proctor Community Hospital (hospital) on February 9, 1981, for repair to her left eardrum and removal of suspected cholesteatoma, a disease of the ear. The plaintiff was placed under general anesthesia. Dr. Adel El-Deiry (doctor) performed the surgery using a speculum and an operating microscope. During the operation, the doctor located a sac of cholesteatoma in the middle ear and removed it. When the doctor determined that the disease did not extend any further, he closed the operative site. A mastoid pressure dressing, which encircled the plaintiff's left ear and head, was applied by the doctor to stop the bleeding from the incision and prevent infection. The plaintiff was then sent to the recovery room.

The plaintiff's account of her post-operative condition was as follows. She testified that upon awaking from the operation she repeatedly complained to the nurses of a bad headache and knife-like pain in her forehead. She attempted to place her finger under the mastoid pressure dressing to relieve the tightness, but was unable to do so. She further stated that she was nauseous and vomiting continuously. According to the plaintiff, she did not see the doctor until the next morning at 11 a.m. when he came to remove the dressing. When the doctor began to remove the dressing, the plaintiff started to cry because her forehead hurt so badly. She stated that there were two marks on her forehead that were bloody and oozing, and that her right eye was puffy.

The doctor's account of plaintiff's post-operative condition varied considerably from that of the plaintiff. He stated that he visited the plaintiff in the recovery room following the operation to determine if the facial nerve was intact, as it can be damaged during the type of surgery the plaintiff underwent. The doctor determined that the nerve was undamaged. Later that evening, around 5:30 or 6 p.m., the doctor visited the plaintiff again to check on her condition. During the evening visit, the patient complained of some pain in the ear area, which the doctor said was to be expected. She complained of nothing unusual. The doctor also spoke with the nurse and ordered the nurse to give the plaintiff an IV because she was nauseous and vomiting. The order was noted on the chart at 6 p.m.

The doctor next saw the plaintiff at 11 a.m. on February 10, 1981, and removed the dressing. The plaintiff was making no unusual complaints, nor was she crying. The doctor noted two red marks on the plaintiff's forehead where the dressing had been. They were not bloody or oozing, nor did the gauze stick to the marks. He believed

the marks were the result of an allergic reaction to the dressing. The right eye of the plaintiff was fine at the time the bandages were removed, but did swell upon release from the hospital. The swelling was attributed to an allergic reaction to antibiotics and was treated. After removing the mastoid pressure dressing, the doctor stated that he applied a smaller dressing to the ear, and discharged the plaintiff from the hospital.

The plaintiff visited the doctor on several occasions following the surgery, and asked him about the scars on her forehead. The doctor treated the scars with ointments and creams. When it was determined that the plaintiff's hearing had diminished in the summer of 1981, the doctor referred the plaintiff to a specialist in Memphis, Tennessee, Dr. John Shea, and sent his records and notes to Dr. Shea. Dr. Shea performed surgery on the plaintiff's left ear to remove cholesteatoma on October 1, 1981, and again on August 21, 1984. Follow-up care was provided by Dr. Shea for both surgeries.

On February 7, 1983, the plaintiff filed suit against the doctor alleging that he negligently failed to remove all of the disease in the left ear, negligently applied the mastoid pressure dressing too tightly, and failed to inform the plaintiff of the risk of facial scarring from the operation. Count II of the complaint alleged that the hospital failed to provide proper medical care and attention to the plaintiff. During the jury trial and over plaintiff's objection, Dr. John Shea testified on behalf of the doctor as an expert relative to the medical standard of care. He offered the opinion that the doctor did not deviate from that standard in either the procedure or the placement of the mastoid pressure dressing. Following trial, the jury rendered a verdict in favor of both the doctor and the hospital, upon which the court entered judgment. The plaintiff appeals. We reverse the judgment in favor of the doctor and remand for a new trial. We affirm the judgment in favor of the hospital.

The plaintiff first argues on appeal that the trial court committed reversible error in allowing the testimony of Dr. John Shea as an expert for the doctor because such testimony violated the doctor-patient fiduciary relationship that existed between the plaintiff and Dr. Shea. Alternatively, the plaintiff argues that the testimony should have been disallowed because the acts of the doctor's counsel in procuring the testimony went beyond recognized rules of discovery.

As was stated, the complaint in this matter was filed on February 7, 1983. At that time, Dr. Shea had performed one surgery on the plaintiff, and the plaintiff remained under his care. On March 25, 1983, the law firm representing the doctor—Heyl, Royster, Voelker &

Allen (defense firm)—wrote Dr. Shea, informed him of its representation of the doctor, acknowledged his treatment of the plaintiff, and expressed a desire to discuss the plaintiff's medical condition with him. On March 30, 1983, Dr. Shea responded to the defense firm's letter by inviting it to Memphis, Tennessee, to "sit down and chat." A conference was held between Dr. Shea and an attorney from the defense firm on June 2, 1983. Five days later, the defense firm sent an affidavit to Dr. Shea, which allegedly reflected Dr. Shea's opinions in regard to the plaintiff, for his signature. Dr. Shea wrote back stating that he would sign the affidavit after part of it was clarified. He also requested "a copy of the suit and a complete list of the [plaintiff's] complaints against Dr. El-Deiry." A copy of the complaint was sent to Dr. Shea, along with the changed affidavit. On March 2, 1984, the defense firm asked Dr. Shea to review the doctor's depositions and requested a second conference with Dr. Shea. On April 30, 1984, Dr. Shea wrote to the defense firm in regard to his scheduled deposition on July 17, 1984, and acknowledged a scheduled meeting between himself and an attorney from the defense firm for July 16, 1984. On August 21, 1984, Dr. Shea performed a second surgery on the plaintiff. At no time did Dr. Shea reveal to the plaintiff his involvement with her legal adversary.

■ We agree with the plaintiff that the court should have disallowed the testimony of Dr. Shea, and that not doing so constituted reversible error. The case of *Petrillo v. Syntax Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, *cert. denied* (1987), ___ U.S. ___, 97 L. Ed. 2d 738, 107 S. Ct. 3232, is directly on point. Petrillo filed suit against the defendant alleging that he was injured as a result of consuming the defendant's infant formula. During discovery, Tobin, an attorney for the defendant, informed the trial court that he had engaged in *ex parte* conferences with Dr. Tomasi, one of Petrillo's treating physicians. *"Ex parte"* was defined by the court as including any discussion that defense counsel has with a plaintiff's treating physician which is not pursuant to the authorized methods of discovery outlined by Supreme Court Rule 201. (107 Ill. 2d R. 201.) Upon Petrillo's motion, the court barred Tobin or other agents of the defendant from engaging in future *ex parte* conferences with any of plaintiff's treating physicians on the ground that it violated public policy. Despite the order, Tobin engaged in such a conference. The trial court found Tobin in contempt of court, and he appealed, presenting a multitude of arguments supporting his contention that defense counsel's *ex parte* communications with the plaintiff's treating physician were proper.

In upholding the ruling of the trial court, the appellate court found that there is a public policy favoring the sanctity and confidentiality of the doctor-patient relationship. That policy is reflected in the medical profession's code of ethics, which consists of (1) the Hippocratic Oath, (2) The American Medical Association's (AMA's) Principles of Medical Ethics, and (3) The Current Opinions of the Judicial Council of the AMA. (*Petrillo v. Syntex Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, 588.) These sources reveal the medical profession's obligation to keep communications divulged by a patient as confidential as possible. The sources also require a patient's consent before confidential information is released. 148 Ill. App. 3d 581, 590.

In addition, the public policy favoring the sanctity of the doctor-patient relationship is reflected in the fiduciary relationship that exists between a doctor and his patient. The nature of this relationship flows not from the physician's ethical duties, but from his unique role in society. (148 Ill. App. 3d 581, 593.) That is, when a patient comes to a doctor for medical assistance, the patient places a trust and confidence in the doctor to act in his best interest. The physician, in turn, owes a duty of good faith toward his patient. 148 Ill. App. 3d 581, 594.

█ Consequently, when a plaintiff's treating physician and legal adversary engage in *ex parte* communications regarding the patient, without the patient's consent, the doctor's ethical duty of confidentiality and fiduciary duty of good faith are undermined, if not completely breached. Moreover, the defense counsel has participated in, if not encouraged, the violation of the doctor's duties and the destruction of the doctor-patient relationship. Thus, we agree with the *Petrillo* court, and hold that such *ex parte* communications and conferences between a plaintiff's treating physician and legal adversary are prohibited as violative of public policy.

In so holding, we reject the doctor's argument that prohibiting such *ex parte* communications will thwart the truth-seeking process. The doctor has failed to identify a single piece of evidence or information which he was able to obtain through the *ex parte* communications with Dr. Shea that he could not have obtained via the conventional methods of discovery outlined by Supreme Court Rule 201. (107 Ill. 2d R. 201.) Presumably, Dr. Shea would have rendered the same opinions in a deposition as he did during the *ex parte* communications. Nothing we are saying today would prohibit a plaintiff's treating physician from expressing his opinions in a court of law, as long as proper discovery procedures have been followed. By barring *ex parte* conferences, we are not thwarting the truth-seeking process; rather, we are

insuring that the opinion of the plaintiff's treating physician is disclosed in a manner that not only discovers the truth, but also protects the confidential and fiduciary relationship existing between a plaintiff and his physician. *Petrillo v. Syntex Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, 597-98.

Neither do we agree with the doctor that the trial court's orders limiting Dr. Shea's testimony sufficiently protected the doctor-patient relationship existing between Dr. Shea and the plaintiff. In ruling on the plaintiff's motion to bar Dr. Shea's testimony, the trial court ordered Dr. Shea to offer no testimony or opinion that would violate the physician-patient privilege in Illinois, but said he could render an opinion based upon those matters available to nontreating expert witnesses for expert testimony. The trial court also ruled that Dr. Shea could not utilize his own records for testimony. In addressing a similar argument, the court in *Petrillo* said:

> "While a protective order and motion *in limine* are effective tools to insure compliance with the rules of evidence, we do not believe that an 'after the fact' ruling by a trial court will sufficiently remedy the potential breaches of trust that will occur should defense counsel be given an unfettered right to engage in *ex parte* conferences with a patient's treating physician." (148 Ill. App. 3d 581, 601.)

Additionally, we do not believe that an "after the fact" ruling by a trial court will give sufficient credence to the public policy favoring the ethical and fiduciary duties owed by a doctor to his patient.

The doctor next suggests that because the plaintiff was unable to show that improper conduct or actual prejudice to her resulted from the *ex parte* communications, she is not entitled to a new trial. We disagree. Prejudice and improper conduct can be implied from the fact that the plaintiff's treating physician has violated his ethical and fiduciary obligations owed to his patient by engaging in *ex parte* conferences concerning the patient with the patient's legal adversary and without the patient's consent.

Similarly, we reject the doctor's suggestion that because the plaintiff continued to treat with Dr. Shea after learning of the *ex parte* communications, the physician-patient relationship was not damaged, and Dr. Shea's testimony was, therefore, harmless. First, it is unclear from the record whether or not the plaintiff learned of the *ex parte* communications. It is possible that her attorney never informed her of the *ex parte* communications, and it is clear that Dr. Shea never informed her of them. Even if she did learn of them, she may have continued to see Dr. Shea out of necessity. Dr. Shea is a specialist in deal-

ing with plaintiff's particular problems and apparently provided her with some relief. In addition, the location of Dr. Shea's practice is convenient for the plaintiff and her family. Also, the plaintiff may have blamed the *ex parte* communications on the defense firm rather than Dr. Shea, since the defense firm initiated contact. We refuse to condone or find harmless the conduct of the defense firm in engaging in *ex parte* conferences simply because the plaintiff continued to seek treatment from Dr. Shea.

Finally, we reject the doctor's suggestion that the defense firm's conduct was justified because at the time of the *ex parte* communications there was no physician-patient privilege in Tennessee, where the conference took place and where the physician-patient relationship between the plaintiff and Dr. Shea was created. This case does not present a conflict of laws problem as the doctor suggests. By our decision today, we have ruled that a plaintiff's legal adversary may not engage in *ex parte* communications with a plaintiff's treating physician. We have regulated the conduct of Illinois attorneys and enforced the Illinois public policy favoring the sanctity and confidentiality of the doctor-patient relationship. Whether or not a physician-patient privilege exists in Tennessee or anywhere else is immaterial.

Because the testimony of Dr. Shea, an expert witness against the plaintiff, was tainted by virtue of the *ex parte* communications, the plaintiff is entitled to a reversal of the judgment against her and a new trial.

■ We next address the plaintiff's contention that the judgment in favor of the hospital was against the manifest weight of the evidence. The plaintiff states that her testimony, the testimony of her husband, the circumstantial evidence, and the expert opinion of Barbara Lee overwhelmingly proved that the plaintiff made complaints which the nurses did not heed, and proved that the nurses did not timely and adequately check the mastoid pressure dressing for tightness. We disagree.

The plaintiff testified that she complained of a severe headache to the nurses at least three times an hour. She stated that she attempted to place a finger under the mastoid pressure dressing to relieve the tightness but was unable to, and that she reported this to the nurses. The plaintiff's husband testified that the plaintiff complained of her head hurting at least 10 times to the nurses during the hours following surgery.

The plaintiff presented the testimony of Barbara Lee, an RN who presently works for another hospital, to give her opinion of the standard of nursing care rendered to the plaintiff. In her opinion, the

nurses at the hospital should have charted the complaints of the patient with more specificity, and they should have notified the doctor sooner with respect to the complaints. On cross-examination, she admitted that she did not know whether and to what extent headache, vomiting, and nausea were to be expected with the type of surgery the plaintiff underwent. She also admitted that she could not tell whether the plaintiff's complaints were unusual. Further, she noted that the doctor had ordered medication for pain and vomiting, so the nurses were to expect it, and that it was a matter of judgment whether a patient is suffering more than normal. Finally, she stated that a nurse is not to loosen a bandage that a doctor has applied.

The hospital presented the expert testimony of the nurses caring for the plaintiff following her surgery. Katie Breen, a retired RN, was the recovery room nurse. She checked the plaintiff's vital signs every 10 minutes, noted nothing unusual about the plaintiff, and said the plaintiff had "perfect scores" upon leaving the recovery room. She also had noted on her chart that the doctor was present with the plaintiff in the recovery room.

Jane Jackson, who no longer works for the hospital, and Vicki Busselmeier were the next nurses to care for the plaintiff, and they completed a post-operative check list regarding the plaintiff. The check list indicated that between 12:10 and 4 p.m. on February 9, 1981, the plaintiff's blood pressure, pulse, respiration and leg movements were checked eight times. The dressing was checked for drainage and tightness seven times. Jane Jackson stated that she noted a small amount of red drainage each time she checked the dressing. When asked why nothing was noted for tightness of the dressing, she replied that she would not have noted anything unless it was unusual. She noted that the plaintiff was suffering moderate ear pain, but said the plaintiff made no unusual complaints of headache or pain.

Janet Monge worked the 3 to 11 p.m. shift on the day the plaintiff underwent surgery. At 6 p.m., she spoke with the doctor in person, and he ordered an IV to be prepared for the plaintiff because of nausea and vomiting. Ms. Monge stated that nausea and vomiting were typical reactions to general anesthesia following surgery. The order was noted on the plaintiff's chart, and signed by the doctor. Though she was not certain whether the doctor actually visited the plaintiff at 6 p.m., Ms. Monge testified that he usually did not come onto the floor unless it was to see a patient. At 7:45 p.m., Ms. Monge gave the plaintiff her second injection of Demarol for headache pain, as authorized by the doctor. At that time, Ms. Monge also noted that the plaintiff remained nauseated and that she was assisted to the bath-

room to void. Ms. Monge made another entry at 10 p.m. when the plaintiff was given an antibiotic. There were no complaints of headache or pain noted by Ms. Monge because, she said, there were none.

Vicki Busselmeier was again on duty the day following the surgery, February 10, 1981. She was present when the doctor removed the mastoid dressing. She noted on the chart that there was a moderate amount of old, bloody drainage present, and further explained at trial that she was referring to the incisional area. She also noted that the plaintiff had ceased vomiting, that she was taking liquids very well, and that the plaintiff was complaining of pain over the ear. According to Ms. Busselmeier, there were no other complaints of pain. Finally, she noted that a smaller dressing was applied to the left ear.

The hospital presented the expert testimony of Patricia Hallford, an RN from the hospital, to give her opinion as to whether the nursing care rendered at the hospital met the applicable standard care. In her opinion, the standard of care was met. She said that several specific complaints of nausea and vomiting were noted on the plaintiff's hospital charts, that the number of complaints were not unusual, that nausea and vomiting were common reactions to general anesthesia, and that the orders for medication from the doctor indicated that the nausea and vomiting were to be expected by the nurse caring for the plaintiff following surgery.

The verdict for the hospital basically turned on the credibility of the plaintiff's witnesses versus the hospital's witnesses. We find ample support for the verdict and judgment in favor of the hospital, and thus, affirm. Accordingly, the judgment of the circuit court of Peoria County in favor of the doctor is reversed and remanded for a new trial, and the judgment in favor of the hospital is affirmed.

Affirmed in part; reversed and remanded in part.

BARRY, P.J., and STOUDER, J., concur.