Mary Helen Bass GOODWIN and William Carl Goodwin, Jr. *v.* William HARRISON

89-76                                                    780 S.W.2d 518

Supreme Court of Arkansas
Opinion delivered November 27, 1989
[Rehearing denied January 8, 1990.*]

---

*Newbern and Turner, JJ., not participating.

476

*Whetstone & Whetstone*, by: *Bernard Whetstone* and *Bob Davidson*, for appellant.

*Friday, Eldredge & Clark*, by: *Phillip Malcom, H. Charles Gschwend, Jr.*, and *Guy Alton Wade*, for appellee.

ROBERT H. DUDLEY, Justice. The appellant, Mary Bass Goodwin, filed this medical malpractice suit against appellee, William Harrison, an obstetrician and gynecologist. She joined Ortho Pharmaceutical Corporation as a defendant. She settled her claim against Ortho and went to trial only against appellee. She contended that (1) he prescribed birth control pills for her without informing her of the risks involved, and (2) that he failed, upon a second visit, to diagnose the fact that the pills had caused her to suffer a blood clot. The jury found in favor of the appellee. The appellant raises eleven (11) points of appeal, which contain numerous additional subpoints. We find no reversible error and, accordingly, affirm.

Appellant initially filed her suit in Lafayette County. Appellee filed a motion alleging venue did not lie in Lafayette County. The trial judge granted the motion and ordered the case transferred to either Washington County or Sebastian County, with appellant being given the choice of counties. She chose Sebastian County, and the appellee did not object. The case was then tried in Sebastian County with the result being a defendant's verdict. Appellant's first assignment of error is the ruling that venue did not lie in Lafayette County.

Before entering the University of Arkansas, appellant lived for nine years with her mother in Lewisville, which is in Lafayette County. After entering the University, she returned to Lafayette County each summer and at Christmas. She maintained her voter registration, post-office box, bank account, and church membership in Lafayette County. After her junior year in college, in May of 1982, she returned to Lafayette County and lived with her mother from May until July, when she got married.

In 1979, she matriculated to the University and lived in Fayetteville, which is in Washington County. In 1982, her junior year, she lived in a sorority house, attended classes, and did all the other every-day things in Fayetteville that any resident student does. She was engaged to be married, and on March 31, 1982, went to appellee for the purpose of discussing and obtaining some form of birth control. During that visit, appellee prescribed birth control pills for her. Soon thereafter she began to take them without any apparent difficulty.

After appellant married in mid-July, she moved to Fort Smith, Sebastian County, to live with her husband. She soon began to have headaches related to sensitivity to sunlight.

On August 27, 1982, the appellant returned to appellee's office in Washington County and complained about pain in her pelvic region during intercourse. She did not mention the headaches. A little over two weeks later she went to the emergency room of a hospital in Fort Smith, Sebastian County, and was found to have a blood clot in her left leg. Ultimately, she had a tubal ligation because of the risks of pregnancy in her condition. She filed suit in Lafayette County against appellee, alleging that on March 31, 1982, appellee prescribed birth control pills to her without obtaining her informed consent, and on August 27, 1982,

negligently failed to diagnose her blood clot. In summary, on March 31, the date of the alleged negligent prescription, appellant was a domiciliary of Lafayette County and a resident of Washington County, and on August 27, the date of the alleged negligent treatment, she was both a domiciliary and resident of Sebastian County. The issue is whether venue lay in Lafayette County.

■ An action for damages for personal injury shall be brought in either (1) the county where the accident occurred which caused the injury, or (2) the county where the plaintiff "resided" at the time of the accident which caused the injury. Ark. Code Ann. § 16-60-112(a) (1987). It is the latter which is the subject of this point of appeal. The appellee did not contest venue lying in Sebastian County. Thus, the issue becomes whether the appellant "resided" in Lafayette County at the time of the accident which caused her injury.

■ The accident which caused the injury means the alleged wrongful conduct of the doctor. *See Heller* v. *Williams*, 204 Ark. 72, 160 S.W.2d 883 (1942), involving the predecessor venue act, and *see Lane* v. *Lane*, 295 Ark. 671, 752 S.W.2d 25 (1988). The initial alleged wrongful conduct occurred on March 31 when appellant was a domiciliary of Lafayette County and a resident of Washington County.

One of the earliest and most frequently cited cases construing our present venue statute, which was enacted in 1939, is *Norton* v. *Purkins*, 203 Ark. 586, 157 S.W.2d 765 (1942). In that case the plaintiff worked in Ouachita County over a period of years. He and his wife rented a house there, and their child went to school there. However, they owned a house in Cleveland County and intended to return there. In holding that Ouachita County was the plaintiff's residence, we quoted from an earlier case that "residence" "means the place of actual abode, and not an established domicile or home to which one expects to return and occupy at some future date."

The next significant case, *Twin City Coach Co.* v. *Stewart, Adm'r*, 209 Ark. 310, 190 S.W.2d 629 (1945), cites *Norton, supra*, as controlling but, in fact, comes close to holding that "residence" means domicile. In that case an eighteen-year-old female left her parents' home in Logan County to obtain work in

Sebastian County. She shared an apartment in Sebastian County with some other girls and worked there six (6) days a week. She returned to Logan County nearly every week on her day off, and her mother laundered her dirty clothes. With no discussion, we summarily decided the issue by writing:

> Circumstances attending the conduct of one who leaves home in search of employment usually afford substantial guidance when (after an injury has occurred and the question of venue is raised) such person's intentions and purposes become the subject of judicial consideration. *See Norton* v. *Purkins, Judge*, 203 Ark. 586, 157 S.W.2d 765; *Southern Compress Company* v. *Elston*, 204 Ark. 180, 161 S.W.2d 202.

One factor in this case may have been that it was decided at a time when eighteen-year-old females were not ordinarily thought of as having independent residences. The next case, *Burbridge* v. *Redman*, 211 Ark. 236, 200 S.W.2d 492 (1947), held that the plaintiff's residence was in Conway County where he owned a home, where his wife and children lived, and where he spent every weekend. It was held not to be at quarters in naval barracks in Ouachita County where he was temporarily working. We cited *Norton* v. *Purkins, supra*, with approval.

In 1949, the residency versus domicile issue again arose, and one of the questions was whether *Twin-City Coach, supra*, had overruled *Norton, supra*. In *Missouri Pacific R.R. Co.* v. *Lawrence*, 215 Ark. 718, 223 S.W.2d 823 (1949), we wrote:

> This case has not been overruled. On the contrary, it was cited with approval in the case of *Twin City Coach Co.* v. *Stewart*, 209 Ark. 310, 190 S.W.2d 629 (1945).

. . .

> [In *Twin City, supra*], There was thus a question of fact as to whether the injured party was a resident of Ft. Smith where she worked 6 days a week, or of Booneville where she rested on the seventh day and had her laundry done, and for that reason prohibition had been denied. It was thought by the dissenting Justice that the opinion in the *Norton* case, *supra* had been weakened if not by implication

overruled, which action met with his approval, as he thought too narrow a view of residence had been taken in the *Norton* case. However, the *Norton* case was not overruled, certainly not expressly, nor by implication, as it was cited with approval in the majority opinion in the *Twin City* case.

In its last analysis the controlling question is whether residence and domicile are synonymous words, meaning the same thing. To hold that they are would overrule the *Norton* v. *Purkins* case, and the cases there cited, and numerous other cases to the contrary.

*Norton* v. *Purkins* has not been overruled by implication or otherwise; on the contrary, it was quoted with approval and followed in the case of *Burbridge* v. *Redman*, 211 Ark. 236, 200 S.W.2d 492, an opinion subsequent to the *Twin City* case, *supra*.

Further, in discussing the difference between residency and domicile, we wrote:

We cannot assume that the General Assembly was unaware of this difference in the meaning of the two words, but on the contrary, we must assume that it was aware of the fact that a person might have a residence in one place and his domicile in another. The venue act does not provide that the plaintiff may sue in the county of his domicile, but provides that if the suit is not brought in the county where he was injured it must be brought in the county where he "resided at the time of injury." The question is not in what county did appellee reside for the longest period of time, but at the time he was injured.

Finally, the cases of *Murry* v. *Maner*, 230 Ark. 132, 320 S.W.2d 940 (1959), and *Belford* v. *Taylor*, 241 Ark. 220, 406 S.W.2d 868 (1966), are not of significance because both cases came up as petitions for prohibition. We explained that where venue is at issue there normally is a question of fact, and prohibition is not the proper remedy when the trial court's authority to act depends upon a disputed question of fact.

In summation, the word "residency" as used in the venue statute means just that; it does not mean domicile. Thus,

the ruling of the trial court that venue would not lie in Lafayette County was correct.

Appellant's next two points of appeal concern jury selection. Neither point has any merit. In the first of the two points, she argues that the trial court erred in refusing to allow her additional voir dire. The material facts are that after voir dire had been completed, appellant's attorney claimed that appellee's attorney had "opened up a number of new elements here and we'll need to follow-up with additional questions." When the court asked what he was referring to, counsel said, "blood clots in her family and other kinds of questions." The court informed appellant's counsel that appellee's counsel had not brought up any unanticipated matters, that appellant's counsel "was allowed all the time he wanted for voir dire and finally stopped, [and that at] some point voir dire must be brought to an end." Appellant did not state what additional questions she would have asked, nor does she explain how she was prejudiced.

■■ The trial court is given great discretion with regard to the voir dire of jurors. So long as that discretion is not abused, and voir dire is not prohibited arbitrarily, the trial court's decision on the appropriate extent of voir dire will be upheld. *See* ARCP Rule 47; *Finch* v. *State*, 262 Ark. 313, 556 S.W.2d 434 (1977); and *Johnson* v. *State*, 298 Ark. 617, 770 S.W.2d 128 (1989). Here, the trial court did not clearly abuse its discretion in refusing to allow further voir dire.

Appellant additionally argues that appellee's attorney engaged in improper conduct while exercising his peremptory challenges. When peremptory challenges were being made, appellant's attorney accused appellee's attorney of "perusing" the appellant's list of strikes before making his own. Appellee's counsel denied he had done so. The court stated, "Let the record reflect that the jury list was made a part of the record; the names were scratched out. There's no way [appellee's counsel] could read them."

■ The appellant has shown nothing to overcome that statement by the court. In addition, she is unable to show prejudice resulting from the defense's alleged misconduct in jury selection, as she is required to do. In *Arkansas State Hwy. Comm'n* v. *Dalrymple*, 252 Ark. 771, 480 S.W.2d 955 (1972), we

wrote:

> [T]he right of peremptory challenges is conferred as a means to reject jurors — not to select jurors, and until such time as a party is forced to take an objectionable juror without the privilege of exercising a peremptory challenge, he has shown no prejudice.

Thus, there is no merit in this point of appeal.

■ Appellant next contends that the entire Arkansas medical malpractice act, Ark. Code Ann. §§ 16-114-201 to -209 (1987), is unconstitutional. She does not explain how the entire act has adversely impacted upon her, a necessary prerequisite to standing, nor does she cite any authority or make a convincing argument to support her position. She merely states her position that the act is unconstitutional because it violates various listed provisions of the federal and state constitutions. As we have said many times, assignments of error which are unsupported by convincing argument or authority, will not be considered on appeal unless it is apparent without further research that they are well taken. *Knoles* v. *Salazar*, 298 Ark. 281, 766 S.W.2d 613 (1989).

The appellant additionally contends that Ark. Code Ann. § 16-114-207(3) (1987), a part of the malpractice act, is unconstitutional. This particular section of the act provides that no medical care provider shall be required to give expert testimony against himself. Again, we do not reach the issue because no authority is cited, no convincing argument is made, and the validity of the contention is not apparent to us.

■ Next, the trial court allowed three physicians to testify as expert witnesses for appellee, even though these physicians had formerly treated the appellant. The appellant assigns this ruling as error. The appellee responds that in two of our cases, *Cathey* v. *Williams*, 290 Ark. 189, 718 S.W.2d 98 (1986), and *Gramling* v. *Jennings*, 274 Ark. 346, 625 S.W.2d 463 (1981), such a practice was followed. That response is correct, but neither case has a holding approving such a practice. However, we now hold that a plaintiff's former treating physician may give his expert opinion for a defendant doctor in a medical malpractice action, so long as the physician-patient privilege is not breached.

The appellant cites cases from other jurisdictions to support her argument that this practice should not be allowed. However, only a few of the cases cited actually deal with the same issue presented here: where the plaintiff's treating physician should be allowed to testify as a defense expert. One of the cases cited by appellant, *Lazorick v. Brown*, 195 N.J. Super. 444, 480 A.2d 223 (1984), implies that such a practice is allowable by holding that simply because the doctor talks to the defense does not mean that he has to serve voluntarily as an expert for the defense at trial. Three other cases cited by appellant do hold that defense counsel was precluded from calling plaintiff's treating physicians to testify at trial, but in each of those cases the prohibition was a punishment for failure of defense counsel to notify the plaintiff of its communications with plaintiff's physicians. *Manion v. N.P.W. Medical Center of N.E. PA., Inc.*, 676 F. Supp. 585 (M.D. Pa. 1987); *Yates v. El-Deiry*, 160 Ill. App. 3d 198, 513 N.E.2d 519, *cert. denied*, 118 Ill. 2d 552 (1987); and *Karsten v. McCray*, 157 Ill. App. 3d 1, 509 N.E.2d 1376, *cert. denied*, 117 Ill. 2d 544 (1987). In fact, the *Yates* case, *supra*, held that a plaintiff's treating physician may not engage in *ex parte* communications with the defense, but "nothing would prevent the treating physician from expressing an opinion in court, so long as proper discovery is followed." Many of the cases cited by the appellant deal with a different issue which is not now before us: whether it is proper for defense counsel to have *ex parte* communications with the plaintiff's treating physicians.

Appellant next contends that the trial court erred in refusing to allow her to read the deposition of Dr. Ed Barron, her family doctor, into evidence in her case-in-chief. She contends that under ARCP Rule 32(a)(3), the deposition of a witness may be used by any party for any purpose if the court finds that the witness is a greater distance than 100 miles from the place of trial, and here, the place of trial was Fort Smith and the witness was in Little Rock, a distance greater than 100 miles. If the issue were that simple, the appellant would prevail. However, it is not so simple.

The facts are that the attorneys were not very cooperative in setting depositions. On April 11, 1988, appellant's attorney complained that it was almost impossible for him to take discovery depositions and asked for court supervision.

On May 5, 1988, the trial judge wrote a letter to the attorneys about taking discovery depositions. In part, it provides:

> I have delayed writing this letter for fear of what I might say. At the Pre-Trial Conference almost my last words concerned *discovery* and my reluctance to become involved in *discovery* disputes. If memory serves me correctly, all agreed that there should be no problems concerning *discovery*. Needless to say I was greatly surprised to learn that problems concerning *discovery* had arisen immediately. However, since the controversy has arisen the following procedure will be followed:
>
> . . .
>
> 2. I will set the dates of depositions without regard to the schedule of either o[f] you or the schedule of the people being deposed.
>
> 3. I will assess an attorney fee ranging from $2,500.00 to $10,000.00 and travel costs from Little Rock to Fort Smith. I may make a mistake as to who should be assessed the attorney fee, but the fee will be assessed. Neither of you should assume that the advantage is in your favor. That would be a great mistake. . . .

(Emphasis added.)

At a pre-trial conference on September 30, 1988, the judge asked appellant's attorney about his medical witness and depositions. The colloquy was, in part, as follows:

> *MR. WHETSTONE* [Appellant's attorney]: Your Honor, we're going to have them all here.
>
> *THE COURT*: So regardless of what the court does, you're not going to try to use the *discovery depositions* as evidentiary depositions? [Emphasis added.]
>
> *MR. WHETSTONE*: We have no present intention of doing that and never have had.

From the foregoing it is manifest that the parties and the court thought they were dealing with discovery depositions, not evidentiary ones. On October 14, 1988, Dr. Barron's deposition

was taken. The stipulation made at the time of taking the deposition does not reflect whether it was a discovery or evidentiary deposition. As the trial commenced, one of appellant's attorneys announced to the court: "Your Honor, we do intend to call Dr. Barrow live. Since he was not going to be able to be here this week, we'll probably try to get him here next week." In fact, shortly before the trial the appellant had not notified Dr. Barron of the trial date, had not asked him to appear as a witness, and had not subpoenaed him. Based upon the foregoing, the trial court ruled:

> In this case, I feel that you have not, on a medical doctor [Dr. Barron], here just a day or two before trial in making an effort to get him here, and the Court is going to sustain the defense position that . . . you simply have made no effort at all to get this man here, intending to use this *discovery deposition*, and it's not fair to the defense to not be able to fully develop the testimony of the witness and cross-examine. When you go in you should put them on notice that you are intending to use this as an evidentiary deposition, or at least some point let them know. Then the Court would certainly entertain that, but I'm going to sustain the position of the defense on that. *I think make every effort to get them here, and then if you cannot, that deposition will be able to be used, and that will be the position-ruling of the court.*

(Emphasis added.)

■ We could affirm on this point simply because appellant's counsel never later told the trial court that he could not get Dr. Barron to trial. However, we choose not to rely solely on that fact.

■ In *Shelter Mutual Ins. Co.* v. *Tucker*, 295 Ark. 260, 748 S.W.2d 136 (1988), we wrote that ARCP Rule 32 outlines the use of depositions; it does not distinguish between discovery depositions and evidentiary depositions. Yet, we know that members of the bar commonly describe depositions as being either discovery or evidentiary. Here, the parties and the court obviously thought that they were dealing with "discovery" depositions, and accordingly, there was an implied agreement that they were not evidentiary depositions and could not be used

as evidence at the trial. Thus, appellant waived the literal wording of ARCP Rule 32.

The appellant next argues that the trial court erred in refusing to qualify a medical doctor as an expert in the field of gynecology. This argument is also without merit. The doctor, Robert Laird, never attended a residency program in obstetrics and gynecology and does not specialize in gynecology. When he served his internship in medical school he delivered babies, but since then he spent twenty-eight (28) years, including reserve time, in the Army medical program. He taught pharmacology in a recognized medical school and was head of the research division of a large drug company. He cannot be said to be intimately familiar with gynecology. He has not held a license to practice medicine in over thirty (30) years. He is basically a medical doctor who went into the field of pharmacology.

The determination of an expert witness's qualifications is within the discretion of the trial judge, and his ruling will not be overturned absent an abuse of that discretion. *McElroy* v. *Benefield*, 299 Ark. 112, 771 S.W.2d 274 (1989); *Phillips* v. *Clark*, 297 Ark. 16, 759 S.W.2d 207 (1988).

The appellant relies on our holding in *Cathey* v. *Williams*, 290 Ark. 189, 718 S.W.2d 98 (1986), that a general practitioner could testify as an expert, even though the defendant's doctor's practice involved a specialty. We said it did not matter if the doctor was a general practitioner or a specialist, so long as he exhibited knowledge of the subject. Here, the witness did not demonstrate an intimate familiarity with the subject of gynecology, and we cannot say the trial judge abused his discretion.

We need not dwell long on the next point. Appellant argues that the trial court erred in refusing to allow her to read the deposition of two medical doctors in her case-in-chief. Since the doctors were present at the trial and testified, the appellant was not deprived of the benefit of their testimony and she can show no prejudice even if the ruling might have been erroneous in some way.

Next, appellant complains about an evidentiary ruling. Appellee's attorney wrote a letter to appellant and her

attorneys, in which he threatened to sue them for filing this lawsuit. He labeled the suit frivolous. Naturally, appellant's attorney tried to get the inflammatory letter into evidence, and the appellee's attorney did not want the jury to see it. The trial judge ruled that the letter was not relevant and excluded it. The appellant assigns the ruling as error. The ruling was correct. The letter did not tend to make any fact at issue more or less probable. *See* A.R.E. Rule 401.

■ Appellant's next point also involves an evidentiary ruling. Dr. Judy Johnson, a psychologist, testified on direct examination for appellant. Appellee commenced cross-examination and, after only a few questions, started to ask about the credibility of another of appellant's psychologist witnesses, Dr. Douglas Stevens. Appellant objected to appellee's asking Dr. Johnson "about the credibility of Dr. Stevens." The trial court overruled the objection. The ruling was correct. A.R.E. Rule 608(a) provides that the credibility of a witness for truthfulness or untruthfulness may be attacked.

■ In her brief, appellant complains that appellee went way beyond the impeachment of Dr. Stevens's character for truthfulness and untruthfulness. The appellant is correct. Appellee's questions, in some cases, called for inadmissible answers, but there were no objections other than the above stated one about credibility. Appellant is attempting to raise the issues argued in her brief for the first time on appeal.

The foregoing part of the opinion addresses all of appellant's points for reversal and, as stated at the outset, we hold there was no reversible error. Appellant, however, raises other points in which she asks us to modify various rulings relating to costs and sanctions.

In the first of these arguments, the appellant contends that the trial court erred in refusing to impose monetary sanctions against appellee's attorneys. The facts necessary for an understanding of the issue are that the parties' attorneys scheduled depositions in various cities. Appellant's attorneys and appellee's attorneys were obviously hostile toward each other. After appellee's attorney and Ortho's attorney completed direct examination of their witnesses, one or the other would unilaterally terminate the deposition, and would offer various excuses for having done

so. Obviously, appellant's attorney's time and expenses on the trip were wasted. Appellant asked for monetary sanctions. The trial judge agreed with appellant's position that the depositions had been wrongfully terminated and ordered that appellee must either forego use of the depositions, or pay the expense of the witnesses to come to Little Rock to complete their depositions. Little Rock is the home of appellant's attorney. The judge declined to impose further sanctions because he found that appellant's attorney was partly to blame for the difficulty and partly at fault in the hostility encountered in the discovery process.

ARCP Rule 37 provides for sanctions for the failure to make discovery. We deem it broad enough to cover this case. The time of taking a deposition is important. Attorney's and client's expenses are at stake. ARCP Rule 30(b)(3) provides, "the court may for cause enlarge or shorten the time for taking the deposition." ARCP Rule 30(d) sets out the procedure for making a motion to terminate or limit the examination of a witness in a deposition. Both actions require a court order. The unilateral termination of the depositions without a court order contravened Rule 30(d), and was wrong.

While the conduct with respect to these depositions was improper, it is established that the imposition of sanctions for the failure to make discovery rests in the trial court's discretion. *See Diaz* v. *Southern Drilling Co.*, 427 F.2d 1118 (5th Cir. 1970). We cannot say the trial court abused its discretion in granting only limited sanctions since the depositions were completed, and especially since the appellant's attorney also was found to be at fault.

Appellant next complains that she has been ordered to pay $5,700 in fees and expenses for two of appellee's expert witnesses, Drs. Quirk and Barclay. We are unable to address the issue because the abstract does not reflect such an order. It is the appellant's burden to make a record showing entitlement to relief. *RAD Razorback Ltd. Partnership* v. *B.G. Coney Co.,* 289 Ark. 550, 713 S.W.2d 462 (1986).

Finally, appellant asks us to award her partial cost of the record. Appellant designated a record on appeal which ultimately consisted of 1,217 pages and a cost of $3,588.58.

Appellee additionally designated a record of 2,433 pages which cost $7,174.22. The appellant was required to pay all of the cost of the record. She contends that the additional parts of the record designated by the appellee were unnecessary and asks for $7,174.22 as costs. Appellee responds that the additional record was necessary. Some of the additional record was necessary, but most was not. Accordingly, we award appellant $5,000 costs.

HICKMAN and GLAZE, JJ., concur.

PURTLE, J., dissents.

NEWBERN, J., not participating.

DARRELL HICKMAN, Justice, concurring. I agree with the result but write to say that I doubt we can distinguish the cases of *Belford* v. *Taylor*, 241 Ark. 220, 406 S.W.2d 868 (1966), and *Twin City Coach Co.* v. *Stewart*, 209 Ark. 310, 190 S.W.2d 629 (1945). Both cases effectively interpret the residence require- ment for venue to mean "domicile." That is an incorrect interpre- tation of the law according to *Norton* v. *Purkins*, 203 Ark. 586, 157 S.W.2d 765 (1942). While *Belford* was a writ of prohibition case, it was decided on the basis of its facts, relying on the *Stewart* case. We ought not leave the *Stewart* and *Belford* cases in the backwater of the law. We should overrule them expressly, which we are doing by implication in this case.

GLAZE, J., joins the concurrence.

JOHN I. PURTLE, Justice, dissenting. "Venue" is the issue in this case. At the time of her injury, the appellant was, in my opinion, a resident of Lafayette County, Arkansas. Her testi- mony concerning her residence was as follows:

> I became a citizen and resident of Lewisville, Arkansas in August of 1970. I lived with my mother, . . . and an older brother. I finished high school there in May of 1979. In September of 1979 I became a student at the University of Arkansas at Fayetteville. In doing this I packed some bags and boxes and other incidentals and put them in my car and drove to Fayetteville where I lived in Fulbright Hall, a women's dormitory with a roommate.

> In Lewisville I had my own room at home and when I would go to school I would take only my necessities and leave

behind in my room and in my home everything else that I owned. Also in Lewisville I had a post office box at all times where I received my mail; I was a registered voter there and voted several times including one election during May of 1982; also had a bank account in my name in Lewisville which remained active for approximately six months or so after my marriage; my car was registered in Lafayette County at all times and still is up to this date; I had a membership in the First United Methodist Church in Lewisville at all times up until October of 1983 and I attended church in Lewisville until the latter part of 1982.

I agree with the majority that this cause of action is controlled by Ark. Code Ann. § 16-60-112(a) (1987), which allows the action to be filed in "the county where the person injured or killed resided at the time of injury." In *Burbridge* v. *Redman*, 211 Ark. 236, 200 S.W.2d 492 (1947), this court held that, for purposes of venue, a party cannot maintain an action in a county where he temporarily works and occupies living quarters, when his wife and children live in another county. This opinion directly contradicts today's holding by the majority. Further, *Burbridge* has not been overruled.

The majority relies heavily on the case of *Norton* v. *Purkins*, 203 Ark. 586, 157 S.W.2d 765 (1942), although it is not factually similar to the present case. In *Norton*, the plaintiff had moved his family and property to Ouachita County where they lived for some time prior to his being injured in an accident in that county. His child was enrolled in school in Ouachita County. The plaintiff in *Norton* brought suit for personal injuries in Cleveland County, from which he had moved a year or two before. He claimed Cleveland County as his legal domicile and asserted that he intended ultimately to return there to live. This court held that the facts of the case established Ouachita County as his residence. The facts in *Norton* and those in the present case are diametrically opposed.

The factual circumstances of this case in the light of our prior decisions, make it clear that the appellant was legally a resident of Lafayette County at the time of her injury. Therefore, the trial court erred in ruling that suit was not filed in the proper county.

The case should be reversed and remanded.