BERT M. MAHAN, Plaintiff-Appellant, v. LOUISVILLE AND NASH-
VILLE RAILROAD COMPANY, Defendant-Appellee.

Fifth District   No. 5—89—0489

Opinion filed August 17, 1990.

Eric D. Jackstadt, of Pratt & Callis, P.C., of East Alton, for appellant.

Thomas E. Jones and Paul P. Waller III, both of Walker & Williams, P.C., of Belleville, for appellee.

JUSTICE HARRISON delivered the opinion of the court:

Plaintiff, Bert Mahan, brought an action under the Federal Employers' Liability Act (FELA) (45 U.S.C.A. §51 *et seq.* (West 1986)) in the circuit court of St. Clair County to recover damages for personal injuries he sustained while working for defendant, Louisville & Nashville Railroad Company (the Railroad). The cause was tried before a jury, which returned a verdict in favor of the Railroad and against plaintiff. After the circuit court entered judgment on that verdict, plaintiff filed a post-trial motion pursuant to section 2—1202 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1202). In that motion, plaintiff requested judgment notwithstanding the verdict on the issue of liability and a new trial on the issue of damages or, in the alternative, a new trial as to all of the issues in the case. Plaintiff's motion was denied, and he now appeals. We affirm.

■ Review by State courts of jury verdicts in FELA cases is to be made in accordance with Federal law. Under Federal law in FELA cases, courts are not free to reweigh the evidence and set aside a jury's verdict merely because the jury could have drawn different inferences or different conclusions or because judges feel that other results are more reasonable. A jury verdict in a FELA case will be set aside only when there is a complete absence of probative facts to support the conclusion reached. (*Meyer v. Penn Central Transportation Co.* (1979), 78 Ill. App. 3d 110, 114-15, 397 N.E.2d 60, 63.) We do not believe that this is such a case.

The injury which gave rise to this litigation occurred on February 18, 1981. At that time plaintiff was employed as a "hostler helper" by the Railroad at one of its train yards. Among his duties was throwing switches on the tracks in the yard so that railroad engines could be moved into position and coupled with the cars they would be pulling. Throwing one of these switches is what plaintiff was doing at the time he claims he was injured.

Plaintiff testified that the switch in question had not been operating properly for some time. Plaintiff explained that this problem was caused by the fact that the ground "was wet, soggy and soft, underneath the rail." Plaintiff stated that he had reported the problem to his supervisors at the yard "every day for at least six months." The last such report he claims to have made was the day before his acci-

dent. At that time, plaintiff allegedly contacted the "maintenance of way superintendent," brought him over to the area where the switch was located, and told him of the problem. Plaintiff testified that the superintendent advised him that he was aware of the problem and would have it fixed.

When plaintiff reported for work on the morning of February 18, which was the day after he had had the discussion with the superintendent, plaintiff's foreman advised him that the defective switch had been repaired. Plaintiff testified, however, that when he attempted to throw the switch, it still failed to work properly. According to plaintiff, he managed to lift the lever mechanism on the switch without difficulty, but when the lever reached a vertical position it "locked" and jerked him to his knees, causing him to injure his back.

An individual named Charles Jump was operating the railroad engine for which plaintiff was throwing the switch. He corroborated that the switch did not operate properly and stated that after this incident, the bed underneath the switch was repaired and the switch then operated as it was supposed to. Jump, however, did not personally observe the events described by plaintiff. The switch-throwing incident was not witnessed by anyone other than plaintiff.

Because the accident described by plaintiff at trial was not witnessed by anyone else, plaintiff's credibility was a critical factor in the case. In an effort to justify the jury's verdict, the Railroad contends that the jury may have concluded that plaintiff's testimony was not believable, in part, because of his claim that he had complained of the defect in the switch every day for at least six months. We note, however, that the Railroad adduced absolutely no evidence to refute this claim, and, contrary to the Railroad's suggestion, we do not believe that it is inherently incredible.

The Railroad's contention assumes either that plaintiff could not possibly have been so persistent, or else that it could not possibly have been so unresponsive to plaintiff's complaints. In our view, there is no foundation in the record for either of these assumptions. We believe that when faced with a potentially dangerous working condition, a worker might very well be as vigorous as plaintiff claims he was in attempting to have the condition remedied. We likewise believe that it is entirely possible that the Railroad may simply have chosen to ignore plaintiff's complaints until after it had received a report that a defect in the switch had been implicated in the injury of a worker. This is especially so given that the defect was evidently not so severe that it rendered the switch totally inoperable and did not interfere with the functioning of the Railroad's switching yard.

The Railroad also argues that plaintiff's testimony regarding how he fell when he attempted to throw the switch was impeached by testimony he had previously given during his deposition. This is not so. The description plaintiff gave at his deposition regarding what happened when he attempted to throw the switch on February 18 was essentially the same as that which he gave at trial.

The Railroad similarly attempts to establish some inconsistency in plaintiff's testimony by pointing out that plaintiff claims that on the day he was allegedly injured he was able to raise the switch to a vertical position, whereas when the switch had previously failed to operate properly, it would not move at all until the train was moved into position next to the switch so that the switching mechanism would not bind. We see no inconsistency here either. As we have indicated, plaintiff testified that he was told on the morning of the accident that the switch had been repaired. This repair work could certainly account for any difference in the operation of the switch.

Although plaintiff stated that on the day of the accident the switch and the area around the switch did not seem to have changed since the previous day, this does not compel a conclusion that no repairs had, in fact, been made and that plaintiff had not been telling the truth when he testified that his foreman had told him that the switch had been fixed. It may mean nothing more than that the repairs effectuated by the Railroad were so limited that they were simply not evident. If, for example, the "repair" was limited to lubrication of the switch mechanism, it would hardly have been obvious to plaintiff as he went about his business on the morning of February 18.

Although we cannot accept the Railroad's arguments on the foregoing points, we nevertheless believe that there are other reasons for which the jury may have had cause to discount plaintiff's claim. As we have noted, the only other occurrence witness whose testimony was presented to the jury was Charles Jump. Jump's description of what occurred immediately after plaintiff's alleged fall differed markedly from the story told by plaintiff at trial, and plaintiff's trial testimony itself differed from the story he had told at his deposition. At trial, plaintiff testified that after he fell, "[Jump] came over to see why I hadn't come back over, and he seen me [sic] on the ground, and he asked me what was wrong, and I told him I had been hurt. And he moved the engine up then and got off and threw the switch himself."

Jump, on the other hand, told a very different story. He stated:
"[I] approached the point and stopped the engine and the engine was headed south. [Plaintiff] disappeared out of my view

to go around and throw the switch. He come back [sic] momentarily and said he couldn't throw the switch. I got off the engine and tried to throw the switch and found it was inoperable, and we left the situation as it was."

At his deposition, plaintiff related yet a third version of what had happened. He testified that after the switch stuck in a vertical position, "we brought the engine up about six inches of the point [where the switch was located], me and the engineer together. *** And he helped me throw it over. It would go then. And I went ahead and made the movement because it was all lined up, and I went and reported it because they was [sic] in a hurry for the train." Plaintiff added that when the engine was positioned near the switch, "the switch almost fell over by itself."

To be sure, these inconsistencies concerned events which occurred after plaintiff was allegedly injured. Nevertheless, they may have caused the jurors to question plaintiff's veracity in general and, thus, to doubt that the switching accident took place as he claimed. Alternatively, the jury may not have believed that the switching accident was the proximate cause of plaintiff's injuries. Deposition testimony from more than a dozen physicians was presented to the jury. That testimony, along with the testimony by plaintiff himself, established that plaintiff had a long history of physical injuries and ailments which began long before the February 18, 1981, switching incident. This included an injury to plaintiff's lower back, which he sustained in a motor vehicle accident in 1945 while he was serving in the armed forces. From that time on, plaintiff continued to have lower back problems and arthritic complaints.

In 1977, plaintiff was involved in two accidents involving the throwing of a railroad switch. In the first incident he injured his right shoulder and missed work for 30 days. After the second incident, he missed no work. In 1978 he was robbed and beaten, as a result of which he was unable to return to work for 18 months. Less than three months after the February 18, 1981, incident, plaintiff was injured when his leg collapsed from under him while he was at home, and in the years that followed he received medical care for a variety of problems, including sinusitis, gout, an ear infection, and various problems with his cardiovascular system. With respect to his cardiovascular system, the most significant problem plaintiff had was unstable angina, a condition which alone would have prevented him from returning to work for the Railroad, regardless of any other ailments from which he may have suffered.

Although there was some testimony which indicated that the Feb-

ruary 18, 1981, incident caused plaintiff to experience some muscle strain in the mid and upper portions of his back, including the area around his shoulders, and that these strains were not simply an aggravation of any of plaintiff's preexisting conditions, one of plaintiff's principle arguments was that the February 18, 1981, incident resulted in injury to his lower back. On this point, the evidence was, to say the least, highly controverted. As we have indicated, plaintiff's lower back problems predated the February 18, 1981, incident by more than 35 years, and plaintiff himself has admitted on appeal that the record is replete with adverse medical testimony regarding his contention that his lower back problems were related to the February 18, 1981, incident.

■■ In light of the foregoing, we agree with the Railroad that the jury could very well have concluded not only that plaintiff's lower back problems were unrelated to the February 18, 1981, incident, but also that whatever other physical problems he had were attributable to previous and subsequent unrelated incidents and had nothing to do with the February 18, 1981, incident at all. Under these circumstances, we cannot say that the circuit court erred in refusing to enter judgment notwithstanding the verdict in favor of plaintiff on the issue of liability and in refusing to grant him a new trial on the question of damages. We likewise do not believe that the evidence was such that the circuit court should have granted plaintiff a new trial as to all issues.

Aside from the sufficiency of the evidence, plaintiff raises a number of additional grounds in support of his claim that he should have been granted a new trial. Of these, the only one which merits discussion is his claim that the circuit court erred in allowing one of plaintiff's treating physicians, Dr. Marker, to give testimony regarding certain CT scans. Plaintiff argues that under *Petrillo v. Syntex Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, 499 N.E.2d 952, *cert. denied* (1987), 483 U.S. 1007, 97 L. Ed. 2d 738, 107 S. Ct. 3232, Marker should not have been permitted to testify about the CT scans because one of the Railroad's attorneys had had an *ex parte* communication with the doctor regarding the scans prior to the doctor's deposition. We cannot accept this argument.

■■ *Petrillo* held that a defendant's attorney could be held in contempt of court for refusing to comply with a trial court's order barring him from engaging in private, *ex parte* conferences with the plaintiff's treating physicians. We have adopted the holding of *Petrillo* (see *Roberson v. Liu* (1990), 198 Ill. App. 3d 332, 336), which has been interpreted to mean that where *ex parte* communications have

taken place between defense counsel and a plaintiff's treating physician, allowing the physician to testify at trial constitutes reversible error, entitling the plaintiff to a new trial (*Yates v. El-Deiry* (1987), 160 Ill. App. 3d 198, 513 N.E.2d 519). Nevertheless, we do not believe that plaintiff is entitled to such relief here.

■ The holding of *Petrillo* was based on the strong public policy in favor of preserving the confidential and fiduciary relationship between a physician and his patient. In this case, the communication between defendant's attorney and plaintiff's physician could in no way have jeopardized that policy. The *ex parte* communication here was limited to a brief discussion, lasting no more than 30 seconds, prior to the physician's deposition during which time the defendant's attorney merely asked the physician if he had seen the plaintiff's CT scans. The doctor indicated that he had not had time to review the scans prior to the deposition but that he had reviewed his notes and determined that the scans were not relevant to what he had treated the patient for. The attorney then apparently asked the physician whether he would then have time to review the scans, and the doctor indicated that it would take him about 5 or 10 minutes to do so and that because of the time factor he would go along with what the hospital radiologist had found regarding the results of those scans.

Plaintiff did not and could not establish that this communication resulted in any prejudice to him or that Dr. Marker's conduct was in any way improper. Plaintiff nevertheless asserts that such prejudice and improper conduct should be implied as a matter of law based on the fact of the *ex parte* communication alone. We disagree. Plaintiff bases his argument on *Yates v. El-Deiry* (1987), 160 Ill. App. 3d 198, 513 N.E.2d 519, but in *Yates*, the defendants' attorneys had had numerous meetings and communications with the patient's physician regarding the patient's medical condition while the plaintiff was still being treated by that physician. The communication here was *de minimis*, and it did not result in the disclosure of any private or confidential information regarding the patient.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

WELCH and CHAPMAN, JJ., concur.