830

JOSEPH NASTASI, Plaintiff-Appellant, v. UNITED MINE WORKERS OF AMERICA UNION HOSPITAL *et al.*, Defendants-Appellees.

Fifth District No. 5—89—0426

Opinion filed February 5, 1991.—Rehearing denied March 26, 1991.

C. Steve Ferguson, of Harlan Heller, Ltd., of Mattoon, for appellant.

George C. Lackey, of Lackey & Lackey, P.C., of Centralia, for appellee Richard O. Fox.

Peter von Gontard, of Sandberg, Phoenix & von Gontard, P.C., of St. Louis, Missouri, for appellee United Mine Workers of America Union Hospital.

JUSTICE HARRISON delivered the opinion of the court:

Plaintiff, Joseph Nastasi, brought an action in the circuit court of Franklin County to recover damages for personal injuries he allegedly sustained as a result of medical malpractice committed by defendants, Dr. Richard O. Fox and the United Mine Workers of America Union Hospital (the Hospital). The case proceeded to trial before a jury. At the close of plaintiff's case, the circuit court entered a directed verdict in favor of the Hospital. At the conclusion of all the evidence, the jury returned a verdict in favor of defendant Dr. Fox and against plaintiff. The court then entered judgment on these verdicts and denied a post-trial motion subsequently filed by plaintiff. Plaintiff now appeals. For the reasons which follow, we affirm the circuit court's judgment as to the Hospital. We reverse the judgment in favor of Dr. Fox and remand for a new trial as to that defendant alone.

The evidence adduced at trial showed that plaintiff was admitted to the Hospital on February 12, 1983, suffering from peptic ulcer disease. Previous medical treatment of plaintiff's ulcers had proved unsuccessful, and he was admitted to the hospital so that Dr. Fox could surgically remove a portion of his stomach afflicted by those ulcers. At the time of his admission, plaintiff had a history of gout, coronary artery disease, and hypertension. He was a heavy cigarette smoker and was obese. Aside from abdominal pains related to his ulcers, however, he had no unusual problems when he entered the hospital. Preoperative tests showed that his circulation was normal, and the results of his blood and urine tests were within normal limits.

Dr. Fox performed the surgery on plaintiff on February 14, during which the lower portion of plaintiff's stomach was removed. Plaintiff's post-operative recovery was essentially unremarkable until February 19. An entry made in plaintiff's hospital records at 5:05 p.m. that day showed that plaintiff was complaining of severe pain which began in his lower back and radiated down into both legs from his thighs to his toes. Throughout the following evening and night, plaintiff complained that his legs hurt badly and that they felt cold and numb. Demerol was administered to him for his pain, but without ef-

fect. A nurse applied warm towels to his feet and wrapped them in sheepskin, but the complaints of coldness and numbness persisted.

Plaintiff evidently believed that his persistent pain was attributable to a gout attack and complained to the nurses about not receiving his gout medication. At 11 p.m. on the night of February 19, the nurses wrapped both of plaintiff's feet in hot packs and again gave him Demerol for his pain. Throughout this period, however, the nursing staff did not contact Dr. Fox to advise him of plaintiff's condition. Dr. Fox was not in fact contacted until 1:30 a.m. on the morning of February 20. At that time, the nursing staff advised Dr. Fox by telephone of plaintiff's complaints. The nursing staff was then ordered by Dr. Fox to administer morphine sulfate, in substantial doses, as needed, and gout medication. This medication was administered throughout the night and into the morning.

At 11 a.m. on the morning of February 20, plaintiff was examined by a physician named Dr. Rao. Based on his examination, Dr. Rao believed that plaintiff was suffering from acute gouty arthritis and prescribed gout medication for him. Dr. Fox himself did not personally examine plaintiff until 3 p.m. that afternoon. Dr. Fox noted that plaintiff had a cold, painful left foot and a dusky, cold right foot and that he had no pulses below the groin. Dr. Fox attributed this to gout and arteriosclerosis. He prescribed medication to open up plaintiff's blood vessels, but did not order, perform, or obtain Doppler blood flow studies or arteriograms, which are commonly used diagnostic measures for circulatory problems. These tests could not in fact have been made without transferring plaintiff to another facility, for the Hospital had no Doppler device and did not perform arteriograms itself.

Dr. Fox continued to monitor plaintiff's condition over the next several days. When plaintiff did not improve, Dr. Fox finally ordered that he be transferred to the care of Dr. Bradley Binnington at St. John's Mercy Hospital in St. Louis, Missouri. That transfer took place on February 24, at which time Dr. Binnington checked plaintiff's circulation with a Doppler machine. That test revealed that plaintiff's circulation was poor, so an arteriogram was performed. The arteriogram disclosed that the actual cause for the circulatory difficulty plaintiff was experiencing was the blockage of his popliteal arteries at the knees. Dr. Binnington promptly performed surgery to remove that blockage, and a second operation was subsequently performed by him on March 2. Although this surgery was evidently of some benefit to plaintiff, his circulatory problems persisted. Plaintiff developed gangrene, some of his toenails had to be removed, and he was ultimately required to have several of his toes amputated. Plaintiff never re-

gained the full use of his legs. He testified at trial that he could no longer swim, go dancing, take walks or even drive a car.

Mary de Meneses, Ed.D., an associate professor at the Southern Illinois University School of Nursing, testified as an expert on behalf of plaintiff regarding standards of nursing care applicable to hospitals. Professor de Meneses identified several examples of how the care provided to plaintiff by the staff of the Hospital deviated from the appropriate standard of care. Among these was the failure of the nursing staff to recognize the abnormality in the circulation to plaintiff's legs on the evening of February 19 and to promptly notify Dr. Fox of plaintiff's condition at that time.

As his medical expert, plaintiff called Dr. David McAfee, the chief of surgery at the Fayetteville, Arkansas, Veterans Administration Medical Center. According to Dr. McAfee, plaintiff's post-operative care was routine until late in the day on February 19. McAfee stated that the nature of the complaints and the findings recorded by the nursing staff at the hospital should have led a surgeon to believe that plaintiff might be suffering from an acute arterial occlusion. In McAfee's view, the appropriate standard of care under these circumstances required that plaintiff be promptly examined. The failure of Dr. Fox to examine plaintiff until the next afternoon was, in McAfee's view, a deviation from the proper standard of care.

McAfee further testified that once Dr. Fox examined plaintiff, he should have ordered an arteriogram without delay in order to identify the obstruction in plaintiff's arteries and relieve it. According to McAfee, if the hospital was not able to perform an arteriogram, plaintiff should have been transferred to a facility at which such a test could have been administered. McAfee opined that Dr. Fox's diagnosis of gout and arteriosclerosis was not reasonable under the circumstances, and that plaintiff's cigarette smoking was not a factor in the circulatory problems which plaintiff developed after the surgery.

In Dr. McAfee's opinion, delays in the proper examination and treatment of arterial occlusions may result in a poorer outcome of the problem and may even result in the need for amputation of limbs, as eventually occurred here. On cross-examination, however, McAfee stated that he had no criticism of the nursing care received by plaintiff, except for the application of hot packs to plaintiff's legs. In his view, this did not aggravate plaintiff's vascular problem, but did intensify the pain he experienced. McAfee also conceded that surgery can precipitate acute gouty arthritis and that some of the pain experienced by plaintiff might have been caused by gout. Nevertheless, McAfee reiterated his view that the diagnosis of gout was incorrect in

this case, and he stated that plaintiff would have faired better had he been operated on sooner. He stated that plaintiff's condition should have been viewed as a emergency at the time, although he conceded that as time passed without plaintiff's feet dying, it became apparent that the situation was not in fact as critical as it should initially have appeared.

Plaintiff also called as a witness Dr. Bradley Binnington, who testified by evidence deposition. Dr. Binnington, the surgeon from St. John's Mercy Hospital who ultimately diagnosed plaintiff's arterial occlusion and performed the surgery to relieve it, testified that he did not believe that he could have obtained a better result had the operation taken place earlier. This testimony contradicted previous testimony he had given during a discovery deposition in which he had stated that earlier surgery would have made a difference. On cross-examination, Binnington explained this contradiction by stating that his medical experience subsequent to the original discovery deposition had persuaded him that he had been incorrect in his views regarding the effectiveness of prompt surgery. The record also showed, however, that in the interval between Binnington's discovery deposition and his evidentiary deposition, he had been contacted by Dr. Fox's attorneys and those attorneys had supplied him with copies of depositions by two physicians, including Dr. Buettner, who was retained by defendant Fox to provide expert testimony on defendant Fox's behalf.

Plaintiff also presented, by evidentiary depositions, medical testimony from Drs. Longwell and Hoffman, who treated plaintiff after Binnington's surgery. Like Binnington, Longwell and Hoffman were each contacted by Dr. Fox's attorneys before their evidence depositions were taken. Although evidence was presented which showed that plaintiff's condition was essentially normal just before Dr. Fox performed surgery, Dr. Longwell testified that the continued post-operative circulatory problems which plaintiff experienced in his legs were attributable to arteriosclerotic peripheral vascular disease, commonly known as hardening of the arteries. In Longwell's opinion, this disease was caused by plaintiff's genetic tendency, his diet, his hypertension, and his cigarette smoking. Dr. Hoffman essentially concurred in this analysis. He stated in his deposition that

> "the fact that [plaintiff] continued to smoke heavily and to not follow proper diet significantly contributed to and were, by far, the major factors that caused his continual and progressive vascular disease of his lower extremities."

In addition to the foregoing, plaintiff offered testimony from his wife, his brother-in-law, and Dr. Fox. He also testified himself. As we

have indicated, the Hospital moved for a directed verdict at the close of plaintiff's case, and its motion was granted. Plaintiff's first argument on appeal is that the entry of the directed verdict in favor of the Hospital and against him was error. We disagree.

■■ A directed verdict should not be entered in favor of a defendant unless all the evidence viewed in the aspect most favorable to the plaintiff so overwhelmingly favors the defendant that no contrary verdict based on the evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.) The courts of this State have also recognized, however, that a directed verdict in favor of a defendant is appropriate when the plaintiff has not established a *prima facie* case. Stated another way, a plaintiff must present at least some evidence on every essential element to his cause of action or the defendant is entitled to judgment in his favor as a matter of law. *Pumala v. Sipos* (1987), 163 Ill. App. 3d 1093, 1098, 517 N.E.2d 295, 298.

■■ A plaintiff bringing a malpractice action against a hospital must prove that the hospital failed to comply with the standard of proper care which guides institutions holding themselves out as devoted to the care and saving of human life, and that this failure resulted in the injury complained of. (*Taylor v. City of Beardstown* (1986), 142 Ill. App. 3d 584, 596, 491 N.E.2d 803, 811.) In this case, the second of these elements was not satisfied, because no evidence was adduced by plaintiff which established that any of his injuries were proximately caused by any act or omission of the Hospital.

■■ Plaintiff's primary complaint against the Hospital was (1) that its nursing staff failed to properly recognize the seriousness of plaintiff's condition on the evening of February 19 and to promptly notify Dr. Fox of plaintiff's condition, (2) that these omissions, and the resultant delays they caused, prevented plaintiff from receiving timely diagnosis and treatment of his condition, and (3) that the delay in diagnosis and treatment, in turn, diminished the effectiveness of Dr. Binnington's surgery, leading to the various circulatory problems he subsequently experienced and causing him to become disabled. We recognize that evidence which shows to a reasonable certainty that negligent delay in diagnosis or treatment lessened the effectiveness of treatment is sufficient to establish proximate cause. (*Northern Trust Co. v. Louis A. Weiss Memorial Hospital* (1986), 143 Ill. App. 3d 479, 487, 493 N.E.2d 6, 12.) In this case, however, no such evidence was presented.

Although plaintiff's nursing expert, Professor de Meneses, did testify that the Hospital's nursing staff did deviate from the proper

standard of care when it failed to promptly notify Dr. Fox on the evening of February 19 and although Dr. McAfee, plaintiff's medical expert, did testify that delays in prompt diagnosis and treatment could cause poorer ultimate results in patients suffering from plaintiff's condition, there was no medical testimony to substantiate that the acts or omissions of the nursing staff ultimately had any impact at all on the outcome of plaintiff's treatment. To the contrary, Dr. McAfee testified that in retrospect plaintiff's condition turned out not to be as critical as it should have appeared to the nursing staff on the evening of February 19, and he placed the responsibility for plaintiff's poor outcome entirely on Dr. Fox, not on the nursing staff.

■ Although McAfee was critical of the nursing care in some respects, he did not suggest in any way that those deficiencies were linked to the injuries which plaintiff ultimately sustained. Plaintiff's other medical witnesses went even further than that. They did not even believe that Dr. Fox's care or lack thereof was a causal factor in the circulatory problems which plaintiff experienced after his stomach surgery. Given the absence of evidence on proximate cause, we must therefore conclude that the circuit court acted properly in granting the Hospital's motion for a directed verdict. We turn then to plaintiff's case against Dr. Fox.

Plaintiff contends that the judgment in favor of Dr. Fox should be reversed and the cause remanded for a new trial against him because of errors made by the circuit court with respect to the admission and exclusion of evidence, because the circuit court erred in instructing the jury, because of improper arguments made by defense counsel during closing argument, because of the trial court's intervention in the examination of witnesses, and because the judgment in favor of Dr. Fox was contrary to the manifest weight of the evidence. Plaintiff also contends that he should be granted a new trial and that additional sanctions should be imposed against Dr. Fox because Dr. Fox's attorneys engaged in *ex parte* communications with plaintiff's treating physicians. We shall consider this latter point first.

■■ ■ Under *Petrillo v. Syntax Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, 499 N.E.2d 952, *cert. denied* (1987), 483 U.S. 1007, 97 L. Ed. 2d 738, 107 S. Ct. 3232, defense counsel may communicate with a plaintiff's treating physician only by means of a formal discovery as outlined in Supreme Court Rule 201 (107 Ill. 2d R. 201). *Ex parte* communications and conferences between defense counsel and a plaintiff's treating physician are prohibited as violative of public policy because they jeopardize the sanctity of the confidential and fiduciary relationship between a physician and his patient. (*Ritter v. Rush-Pres-*

*byterian-St. Luke's Medical Center* (1988), 177 Ill. App. 3d 313, 316, 532 N.E.2d 327, 329.) Where an *ex parte* communication has taken place between defense counsel and a plaintiff's treating physician, sanctions may be imposed upon the defendant, including reversal of the judgment in favor of the defendant and the award of a new trial. *Yates v. El-Deiry* (1987), 160 Ill. App. 3d 198, 204, 513 N.E.2d 519, 523.

The record before us clearly establishes that *ex parte* communications occurred in this case. An evidentiary hearing held prior to the commencement of trial showed that Dr. Fox's attorneys contacted Dr. Binnington, who performed the vascular surgery on plaintiff's legs, on at least three occasions. These communications were by letter, and they each occurred after Binnington had given his discovery deposition but before he gave his evidentiary deposition. Defense counsel's first letter, dated June 21, 1988, purported to set forth the parties' respective positions in the lawsuit and included copies of depositions of other physicians in the case for Binnington's review. The next contact was by letter dated October 17, 1988, and included copies of certain of plaintiff's hospital records together with a copy of the discovery deposition of Dr. John Buettner, defendant Fox's hired expert. The last communication occurred on December 8, 1988, and included the evidence deposition of Dr. Taylor, one of the physicians who treated plaintiff following Dr. Binnington's surgery on his legs.

The record likewise showed that defense counsel had multiple written communications with Drs. Longwell and Hoffman, two of the other physicians who treated plaintiff and were called by him to testify at trial. Defense counsel sent Hoffman copies of depositions given by Dr. Taylor, Dr. Buettner, and Dr. Ryan, the Hospital's proposed expert witness. Defense counsel furnished Longwell with copies of depositions by Dr. Taylor and Dr. Buettner, as well as certain medical records.

■ We believe that these communications plainly violate the rule of *Petrillo* and its progeny. Although there was no evidence that plaintiff's treating physicians actually disclosed any of plaintiff's confidences or breached their fiduciary duty to him, such evidence was not required. What matters is the potential harm to the physician-patient relationship. (*Mondelli v. Checker Taxi Co.* (1990), 197 Ill. App. 3d 258, 265, 554 N.E.2d 226, 272.) That potential is obvious here.

Although defense counsel's first letter to Dr. Binnington admonished that the doctor should not discuss the case with any of the defendant's attorneys, the letter is a detailed one summarizing the parties' respective positions, and it would not have been at all surpris-

ing had the letter elicited some response from Dr. Binnington to defendant's lawyers. Defense counsel's other letters to Binnington and to Drs. Longwell and Hoffman are much less detailed, but they do not even include the cautionary language of the first letter to Binnington. They give no indication that it would not be proper for the doctors to communicate with defendant's lawyers. Under the circumstances, it would scarcely have been surprising had plaintiff's physicians responded to these letters either by contacting defense counsel directly or by communicating with the other physicians whose depositions they had received, including defendant's retained experts.

Unlike the situation in *Mahan v. Louisville & Nashville R.R. Co.* (1990), 203 Ill. App. 3d 748, 561 N.E.2d 127, this case did not involve some *de minimis* conversation regarding incidental matters preliminary to a deposition. What defendant's counsel was clearly attempting to do here is to use the medical testimony they had obtained on behalf of their client to influence or alter the opinions held by plaintiff's treating physicians. That this is so becomes evident when one considers that defendant's counsel made no effort to furnish plaintiff's treating physicians with all of the relevant medical evidence defendant had amassed. Rather, they appear to have provided only that information which they felt would be most effective in persuading plaintiff's treating physicians that the correct theory of the case was defendant's, namely, that the complications plaintiff experienced following his stomach surgery were primarily the result of a progressive arterial disease caused by his smoking, and were not due to any malpractice by Dr. Fox.

■ Because the testimony of plaintiff's treating physicians was tainted by the *ex parte* communications from defendant's counsel, plaintiff is entitled to a reversal of the judgment against him and a new trial. (*Yates v. El-Deiry* (1987), 160 Ill. App. 3d 198, 204, 513 N.E.2d 519, 523.) On retrial, plaintiff's motion for sanctions should be granted, and sanctions should be imposed as follows: the court should bar the testimony of defendant's expert, Dr. Buettner; it should prohibit any examination by defendant's counsel of any of the treating physicians with whom defendant's counsel communicated; it should permit the opinions expressed by Dr. Binnington in his 1985 discovery deposition to be read to the jury as substantive evidence; and it should award plaintiff the attorney fees and costs he incurred in connection with taking the evidentiary depositions of Drs. Binnington, Longwell and Hoffman.

In view of our conclusion that plaintiff is entitled to a new trial on his claims against Dr. Fox, we need not reach plaintiff's contention

that the judgment in favor of Dr. Fox was contrary to the manifest weight of the evidence. Furthermore, because we have granted the sanctions sought by plaintiff, this cause is apt to be litigated differently following remand. The various errors cited by plaintiff regarding the admission and exclusion of evidence, improper questioning of the witnesses, and the manner in which the jury was instructed may therefore not arise again when this case is retried. Accordingly, we shall refrain from reviewing all of these alleged errors at this time. There are, however, a number of matters which, if addressed here, may help avoid further error on remand.

First of all, the circuit court should allow into evidence plaintiff's exhibits 33 and 34. Those exhibits consist of letters written by Dr. Fox concerning his treatment of plaintiff and the complications which plaintiff subsequently experienced. In the letters, Dr. Fox indicates that plaintiff was disabled as a result of the circulatory problems in his legs and that those circulatory problems occurred because of the blood clots which developed in his legs following the stomach surgery. These statements constitute admissions by a party and are relevant because they bear on the question of how plaintiff's post-operative circulatory problems developed. What is particularly significant about them is that they do not attribute plaintiff's post-operative problems to any preexisting condition he may have had. To this extent, they are inconsistent with Dr. Fox's position at trial, which was that the problems plaintiff experienced were caused by arterial disease which resulted primarily from his smoking.

When relevant to issues in the case, admissions by a party are admissible as substantive evidence of the truth of the statements made or of the existence of any facts which they have a tendency to establish. (*Cardiel v. Warren* (1989), 191 Ill. App. 3d 816, 821, 548 N.E.2d 1081, 1084.) This is an exception to the hearsay rule, and it does not require that the admission be made against the interest of the party. (*In re Estate of Lewis* (1990), 193 Ill. App. 3d 316, 323, 549 N.E.2d 960, 964.) As we have indicated, however, the statements contained in the letters were inconsistent with Fox's defense at trial. The letters are therefore also admissible in accordance with the general rule that any statement made by a party or on his behalf which is inconsistent with his position in the litigation may be introduced into evidence against him. (*Oakleaf of Illinois v. Oakleaf & Associates* (1988), 173 Ill. App. 3d 637, 651, 527 N.E.2d 926, 935.) Plaintiff's exhibits 33 and 34 should therefore not be excluded from evidence as they were during the first trial.

■ Although plaintiff's exhibit No. 34 was not admitted into evidence, a portion of that letter was presented to the jury. Thereafter, defense counsel was permitted, over objection, to elicit from Dr. Fox that the letter was sent in connection with plaintiff's claim for social security disability benefits. Unlike cases such as *Conover v. Smith* (1974), 20 Ill. App. 3d 258, 314 N.E.2d 638, the reference to these benefits cannot be justified on the grounds that they helped test the validity and weight of a witness's statements for impeachment purposes. Defendant has not explained, and we cannot see, how placing this letter in the context of a disability claim would affect how the letter should be interpreted or how much weight it should be given by the jury. There is absolutely no indication that anything Dr. Fox said in the letter would have been different had the letter been intended for some purpose other than obtaining disability benefits. Because the reference to social security benefits served no legitimate purpose, it was violative of the collateral source rule (see, *e.g., Evans v. Sisters of the Third Order of St. Francis* (1987), 154 Ill. App. 3d 137, 142-44, 506 N.E.2d 965, 969) and should not be permitted on retrial.

■ On retrial, the circuit court should also prevent defense counsel from inquiring about or making references to plaintiff's divorce and remarriage. If the defendant calls Katherine Stowers as a witness on retrial, as he did at the original trial, the circuit court must also be cautious about defense counsel's examination of her. Stowers was one of the nurses who treated plaintiff following his surgery by Dr. Fox at the Hospital, and she testified at the original trial, over vigorous objection, that during his stay at the Hospital, plaintiff was uncooperative, prone to use "very vulgar language," and "very obnoxious." None of these matters had any relevance to the case, and their only effect could have been to turn the jury against plaintiff by attacking his character. This was wholly improper.

■ Likewise improper was the fact that defense counsel was permitted to elicit from Dr. Hoffman that Hoffman ultimately refused to continue treating plaintiff because plaintiff refused to obey his orders. In view of our previous determination that defense counsel should not be permitted to question Dr. Hoffman at all on retrial, however, this particular problem will not recur and need not be addressed at further length.

■ The circuit court should also, as it did at the first trial, prevent defense counsel from asking Dr. McAfee whether he had ever been sued in a malpractice case and whether sums had been paid on his behalf in settlement of malpractice claims. No possible justification for either of these questions is apparent from the record before us.

Before leaving this point, we must add that the circuit court should prevent questioning on the foregoing topics through entry of an appropriate *in limine* order. The court should not simply wait, as it did at the original trial, until defense counsel has asked the offending question and only then order the question stricken and admonish the jury to disregard the question.

 There is no merit to plaintiff's argument that Dr. Fox should have been prevented from expressing an opinion as to the progress of plaintiff's medical condition after Fox treated him. Plaintiff argued that Fox should not be permitted to render such opinions because he had not been disclosed as an expert witness pursuant to Supreme Court Rule 220 (107 Ill. 2d R. 220). The law in Illinois is now clear, however, that a treating physician does not constitute an expert within the contemplation of Supreme Court Rule 220 (107 Ill. 2d R. 220) and that a treating physician may therefore express medical opinions even though he has not been disclosed as an expert. *Fawcett v. Reinertsen* (1989), 131 Ill. 2d 380, 385, 546 N.E.2d 558, 560.

 Finally, plaintiff contends that the circuit court acted improperly when it examined Dr. Rao, who testified as a witness for defendant Fox, and that it committed multitudinous improprieties during the testimony of Professor de Meneses, plaintiff's nursing expert. On this latter point, plaintiff contends that

"[a]fter just one day of testimony, plaintiff's evidence had been thoroughly disrupted and the integrity of his entire case torpedoed by the court's repeated interruptions of plaintiff's direct examination of Dr. de Meneses, and the frequent commentary and aspersions cast upon the quality of her opinions and testimony."

Based upon our review of the record, we believe that plaintiff's claims of prejudice may be somewhat overstated. Because we are reversing the judgment as to Dr. Fox and remanding for a new trial, however, we do not believe that any purpose would be served by detailing the particular improprieties the trial judge is alleged to have committed. To avoid recurrence of these problems, we think it sufficient simply to order that the cause be tried before a different judge on remand. We also remind the parties and the court that while a trial judge has discretion to question witnesses in order to elicit the truth or clarify material issues which seem obscure, that discretion is not unlimited. In protecting a defendant's right to a fair and impartial trial by jury, the trial judge himself must be fair and impartial, conduct himself so as not to give the jury the impression of his feelings, and not make any comments or insinuations indicative of an opinion on the credibility of

a witness. *People v. Brown* (1990), 200 Ill. App. 3d 566, 576, 558 N.E.2d 309, 315.

For the foregoing reasons, the judgment of the circuit court of Franklin County in favor of the defendant Hospital and against plaintiff is affirmed. The judgment in favor of defendant Fox and against plaintiff is reversed, and the cause is remanded for a new trial against Dr. Fox.

Affirmed in part, reversed and remanded in part.

WELCH and LEWIS,* JJ., concur.

*Justice Chapman participated in oral argument. Justice Lewis was later assigned to this case in substitution for Justice Chapman, and Justice Lewis has read the briefs and has listened to the tape of oral argument.