THOMAS LEWIS, Plaintiff-Appellee, v. ILLINOIS CENTRAL RAILROAD COMPANY, Defendant and Third-Party Plaintiff-Appellant (Matsushita Electric Corporation, d/b/a Panasonic, *et al.*, Third-Party Defendants-Appellees).

Fifth District   No. 5—91—0176

Opinion filed September 17, 1992.—Rehearing denied October 23, 1992.

Paul M. Brown, Bruce D. Ryder, Kathy A. Wisniewski, and Robert T. Mills, all of Coburn, Croft & Putzell, of St. Louis, Missouri, for appellant.

Michael J. Reagan, of Kassly, Bone, Becker, Dix, Reagan & Young, P.C., of Belleville (John Long, of counsel), for appellee Thomas Lewis.

John L. McMullin, of Brown & James, P.C., of Belleville and of St. Louis, Missouri, for appellee Transportation Labor, Inc.

William S. Daniel, of Daniel Law Offices, P.C., of Collinsville, for appellee Matsushita Electric Corporation.

Shaun McParland Baldwin, of Tressler, Soderstrom, Maloney & Priess, of Chicago, for *amicus curiae* Illinois Association of Defense Trial Counsel.

Kevin J. Conway, of Cooney & Conway, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

JUSTICE HARRISON delivered the opinion of the court:

Thomas Lewis brought an action in the circuit court of St. Clair County based on the Federal Employers' Liability Act (45 U.S.C.A. §51 *et seq.* (West 1986)) and common law premises liability to recover damages for personal injuries he sustained while working for the Illinois Central Railroad (the Railroad). The Railroad, in turn, filed third-party actions for contribution against Matsushita Electric Corporation, d/b/a Panasonic (Panasonic), and TLI, Inc. A jury returned a general verdict in favor of Lewis and assessed a total of $3,935,700 in damages against the Railroad. The Railroad recovered nothing on its third-party claims. Judgment was entered on the jury's verdict. The Railroad's post-trial motion was denied, and it now appeals.

The basic questions presented for our review are: (1) whether the circuit court abused its discretion when it barred certain medical evidence under authority of *Petrillo v. Syntex Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, 499 N.E.2d 952, *cert. denied* (1987), 483 U.S. 1007, 97 L. Ed. 2d 738, 107 S. Ct. 3232, based on the Railroad's *ex parte* communications with Lewis' medical providers, and (2) whether the court committed reversible error when it held that settlement agreements between Lewis and Panasonic and TLI had been made in "good faith" within the meaning of the Contribution Act (Ill. Rev. Stat. 1987, ch. 70, par. 301 *et seq.*) and could not be disclosed to the jury.

Although the record in this case is voluminous, the trial itself was reasonably straightforward and the facts are not complex. At all times relevant to this dispute, Lewis worked at the Railroad's Venice, Illinois, train yard as a "piggybacker." His responsibilities included helping to remove truck trailers containing freight from the Railroad's flatcars. On occasion he would also drive those trailers from the train yard to their ultimate destinations. One such occasion was February 26, 1985, when Lewis was directed by the Railroad to deliver one of its trailers containing television sets to Panasonic's ware-

house in St. Louis, Missouri. The trailer was sealed shut with an Illinois Central seal, and there was no evidence that anyone other than the Railroad had had access to its interior.

Upon reaching Panasonic's warehouse, Lewis broke the seal and began unloading the televisions himself, which his orders required him to do. Panasonic, for its part, provided only a forklift carrying a pallet and a forklift operator. The forklift was driven into the rear of the trailer, and Lewis stacked the televisions on the pallet there. In the course of this procedure, Lewis slipped on a patch of heavy oil and fell. In its third-party action, the Railroad argued that Panasonic should be held liable for this accident on the theory that the oil patch was deposited by the forklift. The evidence established, however, that the forklift was electric and used no such heavy oil. The Railroad also theorized that Lewis himself may have tracked the oil into the trailer from the train yard on his boots, but this theory was challenged by testimony, which the jury apparently found more persuasive, showing that the oil patch was located under a stack of television cartons and must therefore have already been present when Lewis first entered the trailer.

The fall injured Lewis' back, but not significantly. After resting for a short time, he was able to finish unloading the trailer and went on his way. Although he subsequently sought medical attention, he missed no work and experienced no real impairment as a result of this accident. What happened the following year was quite a different matter. On February 25, 1986, the Railroad assigned Lewis to work as a "tie-down" man. His job this time was to loosen and lower the stanchions by which truck trailers were secured to the flatcars on which they were transported. Lewis went from flatcar to flatcar performing this operation until he reached a stanchion which was stuck fast. Substantial evidence was presented which indicated that there were only two possible reasons why the stanchion would not move. Either it had been improperly overtightened by Railroad personnel when the trailer was loaded onto the flatcar at the point of embarkation or else it had been improperly maintained.

The Railroad denied that its maintenance was deficient, but the records which would have shown whether the stanchion had been properly cleaned and lubricated no longer existed. They were deliberately destroyed by the Railroad shortly before the case was set for trial. All the Railroad had left was the testimony of a supervisor who claimed that all stanchions were subject to a systematic lubrication and cleaning program. That supervisor conceded, however, that he had no personal knowledge of whether the stanchions were, in fact,

properly and timely lubricated, and those workers who had actual experience with the flatcars stated unequivocally that the lubrication and maintenance did not take place as scheduled. According to them, lubrication and cleaning at the train yard were routinely compromised in the interest of keeping cars in service so that the Railroad could meet its shipping obligations.

The Railroad had men whose responsibility it was to inspect the cars in the yard, but the most those inspectors did was to check the cars visually, and this was not the kind of problem one could detect merely by looking. A manual inspection was necessary. Had the inspectors made such an inspection of the flatcar in question, the defective condition of the stanchion would have been obvious to them. No such inspection was made. Indeed, the evidence suggests that no such inspections were ever made. This was so even though improperly maintained stanchions were commonplace. According to one Railroad worker, if all the cars needing service were taken for maintenance, the Railroad would not have had enough rolling stock left to make up its trains.

To help workers loosen stuck stanchions, the Railroad sometimes made electric wrenches available to them, but when these could be found at all they were often inoperable. In any case, they were normally not powerful enough to do the job. Testimony was also presented that some stanchions could be loosened by having a crane lift up and shake the trailer which the stanchion was holding in place. That procedure, however, was ineffective for the particular type of stanchion involved here. Yet a third possibility was to call in maintenance workers known as "car men" to cut the stanchion with welding equipment. This worked on all types of stanchions but was to be used only as a last resort, as it meant that the flatcar had to be removed from service for repair before it could be used again.

The preferred and customary remedy employed at the Venice train yard for loosening stuck stanchions was simply for the worker to brace himself against the car and push on the stanchion with his foot. That is the method Lewis was taught, it was the method his co-workers routinely followed, and it was the method Lewis employed here. The procedure worked, as it usually did, but when the stanchion finally gave way under the force of his pushing, Lewis fell hard on his back. Somehow Lewis was able to get up and complete his work that day, but he was never fit to work again. The accident proved so serious that Lewis had to have two discs removed from his spine and replaced with steel plates. The neurosurgeon who operated on Lewis' back opined that Lewis was now "physically disabled beyond light or

sedentary work." He attributed this disability primarily to the stanchion incident, as opposed to the fall at the Panasonic warehouse.

When Lewis' pain persisted after the surgery, he consulted a neurologist named Schreiber, who provided an even more bleak assessment. Schreiber testified that Lewis has progressive and permanent nerve damage which causes loss of sensation and muscle weakness. His condition is worsening, and he "absolutely cannot engage in gainful employment." According to Schreiber, the best-case scenario is that Lewis will never work again. The worst-case scenario is that he may ultimately become paraplegic. Schreiber attributed part of Lewis' condition to the fall he suffered at the Panasonic warehouse, but, as with the neurosurgeon, he believed that it was chiefly due to the stanchion incident.

At trial, the Railroad took little issue with the damages Lewis claimed. Rather, one of its primary defenses was that it should not be held liable for those damages because Lewis was not its "employee" within the meaning of the Federal Employers' Liability Act (FELA) (45 U.S.C.A. §51 *et seq.* (West 1986)). According to the Railroad, Lewis was actually employed by third-party defendant TLI. As a preliminary matter, we note that with respect to the stanchion incident, Lewis sought recovery from the Railroad not only under the FELA but also on grounds of common law premises liability. Given that the jury returned a general verdict, one cannot be sure of the particular theory it ultimately relied upon. If the theory was premises liability, whether Lewis was a statutory employee was of no consequence.

■ In any case, there was ample support in the record for the conclusion that Lewis did, in fact, qualify as an employee of the Railroad for FELA purposes. Although Lewis received his paychecks from TLI and was denominated as an employee of TLI under a contract between that company and the Railroad, those factors are not conclusive. According to the United States Supreme Court, a plaintiff may establish "employment" with a railroad for FELA purposes even while nominally employed by another where he is (1) a borrowed servant of the railroad, (2) a servant acting for two masters simultaneously, or (3) a subservant of a company that was in turn a servant of the railroad. (*Kelley v. Southern Pacific Co.* (1974), 419 U.S. 318, 324, 42 L. Ed. 2d 498, 505-06, 95 S. Ct. 472, 476.) Under the FELA, the overriding consideration in determining employee status is simply whether the railroad had control or the right to control the worker in the performance of his job. (*Vanskike v. ACF Industries, Inc.* (8th Cir. 1981), 665 F.2d 188, 198, *cert. denied* (1982), 455 U.S. 1000, 71 L.

Ed. 2d 867, 102 S. Ct. 1632.) Such control was unquestionably present here.

■ The Railroad originally hired Lewis. It provided all tools and was responsible for all equipment he used. If Lewis wanted to take vacation or sick days, he had to check with the Railroad. If he wanted to work overtime, it was the Railroad he asked. The Railroad gave Lewis his daily work assignments and supplied the logs he was required to keep when driving trucks. While driving those trucks, Lewis carried a card identifying the Railroad as the carrier. If Lewis were ticketed for violating trucking regulations, the Railroad would pay the fine. Had Lewis ever engaged in any work-related misconduct, it was the Railroad which would have initiated disciplinary measures. Although TLI was the signatory to the Teamsters contract which covered Lewis, that contract was negotiated at the Railroad's behest under the terms it wanted.

As a practical matter, TLI's function was limited to providing bookkeeping and payroll services for the Railroad. It sent out paychecks (based on time computed by the Railroad); paid the payroll taxes; and forwarded notices to the workers when the Railroad so requested. None of these payroll and related expenses was borne by TLI. They were reimbursed in full by the Railroad. On the rare occasions when a member of TLI management visited the Railroad's train yard, he never gave orders to any of the workers there, nor did he provide advice or help with respect to use of the equipment. In fact, a Railroad supervisor testified that had TLI representatives come on to the premises and attempted to fix defective or unsafe equipment, the Railroad would have ordered them to leave on threat of arrest.

With respect to the issue of damages, Lewis sought only $350 for the medical expenses he incurred after his fall at the Panasonic warehouse. For the stanchion incident, he asked the jury to award him $3,935,350 for disability and disfigurement, pain and suffering, medical care, and lost earnings. Although this sum was substantial, it was well within the range of damages established by the evidence. As we indicated at the outset of this disposition, the jury ultimately returned a verdict in favor of Lewis, awarding him the precise amounts he requested. The jury also ruled against the Railroad on its third-party claims against Panasonic and TLI. The circuit court entered judgment on those verdicts and denied the Railroad's post-trial motion. This appeal followed.

The primary issue presented for our consideration has nothing to do with the sufficiency of the evidence or the amount of damages. The Railroad's chief complaint is that the circuit court abused its dis-

cretion when it imposed sanctions on it for violating the rule established in *Petrillo v. Syntex Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, 499 N.E.2d 952, *cert. denied* (1987), 483 U.S. 1007, 97 L. Ed. 2d 738, 107 S. Ct. 3232, which provides that defense counsel may communicate with a plaintiff's health care providers only through formal discovery procedures as outlined in Supreme Court Rule 201 (134 Ill. 2d R. 201).

The offending conduct here began in July of 1990, when counsel for the Railroad sent letters to the offices of eight different doctors and hospitals from which Lewis had received medical treatment in the State of Illinois. Each of those letters contained a subpoena *duces tecum* issued by the clerk of the circuit court of St. Clair County directing the particular entity's custodian of records to produce Lewis' medical records at a deposition. The letters indicated, however, that if the records were mailed directly to the Railroad's lawyer in advance, the depositions would be cancelled. The Railroad's lawyer made this solicitation even though Lewis had not given the Railroad any medical release authorizations or otherwise consented to direct contact between the Railroad and his health care providers.

Copies of the subpoenas and the corresponding notices of deposition were sent to Lewis' lawyer, but the Railroad's lawyer kept secret the existence of the accompanying letters soliciting copies of the medical records. On August 3, 1990, Lewis' lawyer sent a letter to counsel for the Railroad expressly admonishing that he would not agree to allowing the health care providers to mail the medical records to the Railroad in lieu of depositions. Despite this, counsel for the Railroad sent another round of letters and subpoenas like the first, this time directed to seven doctors and hospitals where Lewis had received care in the State of Missouri. Again, counsel for the Railroad proceeded without any authorizations executed by Lewis, and again counsel for the Railroad did not disclose to Lewis' lawyer his direct solicitation of the records.

Predictably, all of the health care providers contacted by counsel for the Railroad opted to avoid the depositions and to mail him copies of Lewis' medical records. Those records encompassed all of Lewis' care. They were not limited to the injuries which gave rise to this litigation. By a letter faxed on August 20, 1990, counsel for the Railroad advised Lewis' attorney that the seven Illinois medical providers had mailed Lewis' records directly to him and that their depositions would therefore be cancelled. Lewis' lawyer immediately protested that counsel for the Railroad had ignored his previous admonition, demanded that all of the records be returned to the respective medical

providers, and advised that the depositions should be reset so that the records could be dealt with there. Lewis' lawyer warned that he would seek sanctions from the court if counsel for the Railroad did not comply, but this was to no avail. The records were never returned. Lewis' lawyer sent another letter to the Railroad's attorney at the end of September demanding again that any discovery of medical records be accomplished through depositions, but again his wishes were not heeded. To the contrary, counsel for the Railroad proceeded yet a third time to try to obtain medical records directly from the provider outside of formal discovery channels.

After this last incident, Lewis moved for sanctions pursuant to Supreme Court Rule 219(c) (134 Ill. 2d R. 219(c)). Following a hearing, the circuit court granted that motion and issued an order which held that the Railroad

"is debarred from using any and all medical information that was received after August 3, 1990 from any provider of medical care, in response to [the Railroad's] Subpoena Duces Tecum for deposition and ex parte letter. This includes information that was generated by some other source but which was found in the provider[']s file. (E[.]g., letter from a referring doctor, x-ray reports, etc.)"

The order also barred the Railroad from "examining or cross-examining any such medical provider" or "from having any witness rely upon or refer to any such medical information."

After this order was entered, the case was transferred to a different judge for trial. At the request of counsel for the Railroad, the new judge, acting in the name of his predecessor, issued a clarification of this order, which specified that the Railroad would be prevented from

"examining or cross-examining any medical provider whose office was contacted subsequent to August 3, 1990, even if no new medical records were obtained from such providers or the medical records supplied by such providers were only duplicates of records obtained via subpoena in 1988.

Additionally, [the Railroad] is debarred from using *all* records obtained after August 3, 1990, via subpoena without deposition, even if such records were only duplicates of records obtained in 1988." (Emphasis added.)

The order then went on to list 17 specific health care providers whom the Railroad would be prohibited from examining or cross-examining at trial.

■ The Railroad argues that these sanctions were improper because its conduct did not fall within the prohibitions established in *Petrillo v. Syntex Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, 499 N.E.2d 952, *cert. denied* (1987), 483 U.S. 1007, 97 L. Ed. 2d 738, 107 S. Ct. 3232. We disagree. As we have indicated, *Petrillo* requires that any contact between defense counsel and a plaintiff's health care providers be carried out only under the rules of formal discovery. No rule of discovery authorizes the surreptitious *ex parte* communications made by defense counsel here.

It is no defense that the Railroad's *ex parte* communications were made by letter and not in person (see *Nastasi v. United Mine Workers of American Union Hospital* (1991), 209 Ill. App. 3d 830, 567 N.E.2d 1358), nor can the Railroad justify its actions on the grounds that all it sought were written records. After all, the physician-patient privilege, which is what the *Petrillo* rule is designed to safeguard (see *Ritter v. Rush-Presbyterian-St. Luke's Medical Center* (1988), 177 Ill. App. 3d 313, 316, 532 N.E.2d 327, 329), is not limited to oral testimony by a physician. It also extends to records kept by the physician or by a hospital concerning a patient's treatment. Annot., *Physician-Patient Privilege As Extending to Patient's Medical or Hospital Records*, 10 ALR 4th 552, 557 (1981); see *Parkson v. Central Du Page Hospital* (1982), 105 Ill. App. 3d 850, 435 N.E.2d 140.

■ The Railroad attempts to evade these principles by arguing that the physician-patient privilege is not really involved here at all because its secret *ex parte* letters were nominally addressed only to the "records custodians" of the doctors and hospitals involved in Lewis' treatment. This distinction is wholly artificial and completely meaningless. A request to a medical provider's custodian of records is and must be equivalent to a request to the medical provider himself. As we recognized in *Roberson v. Liu* (1990), 198 Ill. App. 3d 332, 338, 555 N.E.2d 999, 1003, doctors cannot perform their jobs alone. They need help in delivering medical services to others. If these support personnel are not cloaked with the same privilege as the physicians themselves (and the physicians' records), the privilege could be readily breached. Accordingly, our court has expressly held that the *Petrillo* doctrine is not limited to physicians. It also "may be properly applied to a health professional other than a physician who, in a professional capacity, has assisted a physician in the treatment of a plaintiff" (*Roberson v. Liu*, 198 Ill. App. 3d at 338, 555 N.E.2d at 1003) and to those individuals who work in offices providing health care and who, in the course of their employment, work directly with a patient's files and "possess[ ] and [have] access to the confidences of the patient and

his treating physician," regardless of whether those individuals qualify as health care providers themselves (*Wakeford v. Rodehouse Restaurants of Missouri, Inc.* (1991), 223 Ill. App. 3d 31, 46, 584 N.E.2d 963, 973).

■ *Amicus curiae*, the Illinois Association of Defense Trial Counsel, urges us to reject the *Petrillo* doctrine. This we decline to do. That doctrine is sound in policy and straightforward in application. It incorporates no hidden tricks or traps for the unwary. Unless express prior consent has been obtained from the plaintiff, defense counsel simply should not make *ex parte* communications with the plaintiff's medical providers. Any discussions between defense counsel and those medical providers must take place pursuant to the rules of formal discovery. Why defense counsel persist in violating this basic proposition we do not know. In any case, the Railroad's lawyer did commit such a violation here. Indeed, as our review of the record indicated, he actually committed at least 16 such violations and he did so despite protests from Lewis' counsel.

■ Contrary to the Railroad's argument, none of these violations fell within the *de minimus* exception we recognized in *Mahan v. Louisville & Nashville R.R. Co.* (1990), 203 Ill. App. 3d 748, 561 N.E.2d 127. The matters at issue here were in no sense incidental or preliminary. They went directly to the heart of the physician-patient privilege. For the purposes of *Petrillo*, requesting Lewis' medical records as the Railroad's lawyer did here was no different than if that lawyer had called up the treating doctors and said, "Tell me everything you know about Lewis' medical history."

■ Barring the Railroad from examining or cross-examining witnesses who were improperly contacted or from using records that were obtained through those improper contacts was an appropriate sanction for the Railroad's *Petrillo* violations (see, *e.g., Pourchot v. Commonwealth Edison Co.* (1992), 224 Ill. App. 3d 634, 637, 587 N.E.2d 589, 591-92; *Nastasi v. United Mine Workers of American Union Hospital* (1991), 209 Ill. App. 3d 830, 840, 567 N.E.2d 1358, 1366) and did not offend due process under any standard of which we are aware. There was nothing unfair or arbitrary about the court's action. To the contrary, the court's efforts to be just in fashioning an appropriate remedy are reflected in the fact that the court restricted the sanctions to the records received and medical providers contacted after August 3, 1990, the date when Lewis' counsel objected to the procedure in writing. This limitation was not necessary, for while a plaintiff's consent to *ex parte* contacts will preclude *Petrillo* sanctions, nothing in the *Petrillo* doctrine obligates a plaintiff to affirma-

tively assert his rights under that doctrine at the time of the violation in order to preserve his entitlement to sanctions. After all, since the improper contacts are *ex parte*, how can he be expected to know at the time that anything objectionable has occurred?

The Railroad protests vigorously that the sanctions went too far because in some cases the improper contacts yielded material that was merely duplicative of documents which had previously been obtained properly or without objection. In making this argument, what the Railroad is really saying is that it should not be punished where no actual prejudice resulted. The law is now settled, however, that a *Petrillo* violation occurs regardless of what information is actually revealed. Whether the contact was indeed harmless is irrelevant. *Pourchot v. Commonwealth Edison Co.* (1992), 224 Ill. App. 3d 634, 637, 587 N.E.2d 589, 591.

■ The next argument the Railroad makes concerns settlements entered into between Lewis and Panasonic and Lewis and TLI at the conclusion of the evidence, just before closing arguments to the jury. The Railroad contends that the circuit court erred in finding that these settlements were made in "good faith" within the meaning of the Contribution Act (Ill. Rev. Stat. 1987, ch. 70, par. 301 *et seq.*) because the court made that finding without first conducting a proper hearing. Although a "good faith" hearing was, in fact, held, the Railroad claims that the hearing was inadequate because the court did not permit it to subject the lawyers for Lewis, Panasonic and TLI to questioning under oath concerning their settlement negotiations. This argument is not well taken. Forcing opposing counsel to testify as witnesses during trial is an extreme measure which would have been wholly unwarranted here. The circuit court was thoroughly familiar with this litigation, and counsel for Lewis, Panasonic and TLI described to the court, in detail and on the record, how, when, and under what terms the settlements were achieved.

The court had no reason not to take these attorneys at their word. Under the rules of our supreme court, a lawyer is prohibited from making "a statement of material fact or law to a tribunal which the lawyer knows or reasonably should know is false." (134 Ill. 2d R. 3.3(a)(1).) Given this prohibition, and the attendant sanctions which counsel would face for its violation, counsel's factual statements to the court must be considered presumptively true. This presumption is, of course, rebuttable, but there is nothing in the record before us which suggests that the presumption should give way here. To the contrary, the one witness who was questioned under oath regarding

the settlement, an employee of TLI, fully corroborated the lawyers' representations to the court.

Despite this testimony, the Railroad insists now, as it did at trial, that the lawyers for Lewis, Panasonic and TLI were lying. It hypothesizes that Lewis, Panasonic, and TLI actually agreed to settle early on in the case but kept their agreement quiet in order to preserve the illusion that they were adversaries when they were not. This deception was important, according to the Railroad, because it made the witnesses for TLI and Panasonic who gave testimony favorable to Lewis appear more credible than they would have otherwise.

A fundamental problem with the Railroad's hypothesis is that TLI and Panasonic and Lewis never, in fact, took an adversarial posture with respect to one another at trial, nor did they ever give the jury the impression they were adversaries. From opening to closing arguments, TLI and Panasonic took a constant and compatible position, which was to concede the seriousness of Lewis' injuries, but to place all blame for those injuries on the Railroad. That the Railroad alone was solely responsible for Lewis' injuries was, of course, exactly the same position taken throughout the case by Lewis himself, who never sought recovery from either Panasonic or TLI. The only reason Panasonic and TLI were in the case at all was because the Railroad sued them. We note, moreover, that when the possibility of recovering on its workmen's compensation lien was factored in with its liability exposure, TLI was left in a situation where a verdict against the Railroad was clearly more beneficial to it financially than a verdict against Lewis would have been. In the end, both TLI and Panasonic argued as they did to minimize their perceived monetary exposure, and that is exactly what they told the trial court. There was nothing at all subtle, sinister, or unexpected about their actions.

What type of evidentiary hearing should be conducted to produce the facts necessary to determine whether a settlement was made in "good faith" is committed to the discretion of the trial court. (*Roberson v. Belleville Anesthesia Associates, Ltd.* (1991), 213 Ill. App. 3d 47, 51-52, 571 N.E.2d 1131, 1134.) Under the foregoing circumstances, it was scarcely an abuse of discretion for the circuit court here to refuse the Railroad's request to subject opposing counsel to the extraordinary measure of being examined under oath. That request was utterly groundless. It was also an affront to the dignity of the profession. While lawyers' currency may be diminishing in the public's mind, honesty and integrity remain precious to most practitioners. We admonish counsel for the Railroad that if he levies

charges of dishonesty against his colleagues again, he should come prepared with more than unsubstantiated suspicion.

The Railroad next asserts that it is entitled to a new trial because the circuit court prevented it from presenting to the jury evidence of the settlement agreements between Lewis and Panasonic and TLI. This was reversible error, according to the Railroad, because the agreements would have helped the jury to "understand the true interests and alignment of the parties." As we have just discussed, however, there was nothing about the parties' alignment which was not already apparent from the first day of trial. Moreover, even where settlement evidence might be admissible to prove a point like witness bias, the decision to admit or exclude that evidence rests with the discretion of the trial court. (*McGrath v. Chicago & North Western Transportation Co.* (1989), 190 Ill. App. 3d 276, 281-82, 546 N.E.2d 670, 673.) No abuse of discretion was established here.

The Railroad advances a litany of additional errors allegedly made by the circuit court concerning the admission of evidence, the giving of instructions to the jury, and the arguments of counsel. We have considered these matters carefully and have concluded that they do not warrant further discussion. To the extent that errors may have been made which were not waived by the Railroad's failure to interpose timely objections, we do not believe that they were sufficient, singly or considered as a whole, to warrant setting aside the jury's verdict. As we have previously observed, that verdict was fully supported by the evidence. No serious claim can be made that it was the product of passion or prejudice. Accordingly, the judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

WELCH and H. LEWIS, JJ., concur.